287 F.2d 126
 Thomas C. KEININGHAM, Appellant,
v.
UNITED STATES of America, Appellee.
William R. ROBEY, Appellant,
v.
UNITED STATES of America, Appellee.
Harry A. KAUFMAN, Appellant,
v.
UNITED STATES of America, Appellee.
Donald L. WASHINGTON, Appellant,
v.
UNITED STATES of America, Appellee.
Harold SNOWDEN, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 15730-15734.
 United States Court of Appeals District of Columbia Circuit.
 Argued September 19, 1960.
 Decided November 10, 1960.
 Petition for Rehearing En Banc Denied January 10, 1961.
 
 COPYRIGHT MATERIAL OMITTED Mr. Kenneth D. Wood, Washington, D. C., for appellants.
 Mr. Maurice R. Dunie, Asst. U. S. Atty., at the time of argument, with whom Messrs. Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.
 Before EDGERTON, DANAHER and BASTIAN, Circuit Judges.
 BASTIAN, Circuit Judge.
 
 
 1
 Appellants Keiningham, Robey, Kaufman, Washington and Snowden were convicted, after trial by the court without a jury, of violating the District of Columbia gambling laws.
 
 
 2
 On a number of occasions during the period from June 17, 1959, to July 10, 1959, a police officer in plain clothes observed the movements of appellants (with the exception of Kaufman) and, on five separate days, they were seen entering 1106 Eighteenth Street, N. W., which is one in a series of row houses each of which is connected by party walls to the house on either side. On the morning of July 10, 1959, the officer described his observations to the United States Commissioner, who then issued arrest warrants for all of the appellants, except Kaufman,[1] and a search warrant covering 1106 Eighteenth Street, N. W.[2] On the afternoon of the same day, eight police officers proceeded to those premises to execute the warrants.
 
 
 3
 Officer Carter identified appellants Keiningham, Robey, Washington and Snowden as they approached and entered 1106. In the meantime, lookouts had been posted at the rear of the house to insure that no one who entered could leave unobserved. The officers entered the premises by the front door, which was open, and were immediately confronted by two doors, one leading to the downstairs part of the house and the other leading upstairs. They knocked on the door to the downstairs portion, made a proper announcement, and were admitted. A search showed that the men sought were not present there.
 
 
 4
 The officers then knocked on the door leading to the second floor, and again made a proper announcement. Receiving no response, they forced the door and proceeded to search the second floor. Again the officers discovered that the men they had observed entering the premises only a short time before were not present. At this point, the officers proceeded to the second floor rear porch and observed appellant Keiningham's car parked in the back yard and a check with the officers stationed outside showed that no one had left the house. The officers then observed, on one side of the porch, a partition between 1106 and 1108 Eighteenth Street, N. W., in which there was a freshly cut door, and "tools lying all around." The police lieutenant in charge testified:
 
 
 5
 "I went to the door and there was what I would identify as an oblong type of metal knob that appeared to be part of the locking device for the door, which I tried. It turned, but the door did not open. I then pushed on the door and of course the partition was very flexible, and I felt that the door was probably stuck because of the way that — * * * I then pushed on the door, using more strength, and the door actually opened."
 
 
 6
 The officers then saw that this door led to the second floor rear porch of the next house, 1108 Eighteenth Street, N. W. They made no announcement that they were police officers, but proceeded through the door and then looked through the glass pane in a door leading from the porch of 1108 to the inside of those premises. Through a slit in a shade drawn over the pane, the officers were able to see and identify appellants, who were busily conducting a numbers operation. The officers knocked on the door and announced: "Police, we have arrest warrants for gambling violations." When appellants began to run in the opposite direction, the officers forced the door open, arrested appellants, and seized papers, numbers slips, adding machines, and other gambling paraphernalia.
 
 
 7
 Prior to trial, appellants made a timely motion to suppress the evidence thus seized, which was denied. The motion was renewed at the close of the Government's case in the trial court and again it was denied. Appellants offered no evidence. They were found guilty and this appeal followed.
 
 
 8
 The Government contends that, since appellants were using the two houses as a single unit, the search warrant for 1106 should somehow be construed to embrace 1108 as well. It seems to be the Government's theory that 1108 became part of 1106 because of the use to which the two houses were put by appellants. This contention is unsound. We know of no clause in the warrant issued extending the authority granted therein in the event of unforeseen circumstances,[3] and it is well settled that search warrants must be strictly construed. The authority to search is limited to the place described in the warrant and does not include additional or different places.
 
 
 9
 Appellants contend that, under the authority of McKnight v. United States, 1950, 87 U.S.App.D.C. 151, 183 F.2d 977, the police officers can not justify a search of 1108 as incident to a lawful arrest under the arrest warrants. Under the view we take of this case, it is unnecessary for us to decide the applicability of McKnight to these facts.
 
 
 10
 The officers left premises 1106 and entered premises 1108 at the time they opened and passed through the door in the partition separating the porches of the two houses. We need not consider whether the arrest warrants, together with a proper announcement, would have justified the officers in breaking and entering 1108. Breaking and entering without an announcement was clearly illegal, and the improper entry renders the subsequent search invalid. A long line of decisions of the Supreme Court and of this court on search and seizure emphasize the individual's right to privacy in his home. Surely that right requires police officers who seek to invade that privacy at least to knock and announce themselves before barging in. See Miller v. United States, 1957, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332; Gatewood v. United States, 1953, 93 U.S. App.D.C. 226, 209 F.2d 789; cf. Ellison v. United States, 1953, 93 U.S.App.D.C. 1, 206 F.2d 476. The embarrassing consequences which could easily flow from unannounced intrusions are numerous. See Mr. Justice Jackson's concurring opinion in McDonald v. United States, 1948, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153.
 
 
 11
 Nor need we here decide whether a search of 1108 without either a search warrant or an arrest warrant might have been so made as to be "reasonable" under United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. For it is inconceivable that less should be required of an officer acting without a warrant than is required of him under a valid warrant. Even if the search of 1108 had been made pursuant to a search warrant, the officers would have been required to state their identity and purpose before opening the door. 18 U.S.C. § 3109. See McDonald v. United States, supra; Accarino v. United States, 1949, 85 U.S.App.D.C. 394, 179 F.2d 456. Since the entry into 1108 was made without permission and was not preceded by an announcement, that entry was improper and the search which followed that improper entry cannot be upheld even if the search would otherwise have been valid. As was said by the Supreme Court in Miller, supra, and by this court in Accarino v. United States, it is 18 U.S.C. § 3109 which defines the duties of officers executing warrants.
 
 
 12
 A few cases have sought to distinguish between a locked and an unlocked door, in terms of the officer's duty to make an announcement before entering. E.g. United States v. Silverman, D.C.D.C.1958, 166 F.Supp. 838; United States v. Bowman, D.C.D.C.1956, 137 F. Supp. 385. This distinction seems to view entry through an unlocked door as "peaceful." See Ellison v. United States, supra; Palmer v. King, 1914, 41 App. D.C. 419, L.R.A.1916D, 278. We think that a person's right to privacy in his home (and the limitation of authority to a searching police officer) is governed by something more than the fortuitous circumstance of an unlocked door, and that the word "break," as used in 18 U.S.C. § 3109, means "enter without permission." We think that a "peaceful" entry which does not violate the provisions of § 3109 must be a permissive one, and not merely one which does not result in a breaking of parts of the house. We hold that the officers "entered" 1108 when they passed through the door in the partition, and we decide these cases on the narrow ground that an announcement, at least, was required at that time.
 
 
 13
 The motions to suppress should have been granted, and the judgments of the District Court are
 
 
 14
 Reversed and the cases remanded.
 
 
 
 Notes:
 
 
 [1]
 Kaufman was arrested without an arrest warrant in the course of the raid which followed
 
 
 [2]
 A search warrant covering 69 U Street, N. W., was also issued but is not involved in this appeal
 
 
 [3]
 The one case cited to support the Government's proposition, United States v. Hinton, 7 Cir., 1955, 219 F.2d 324, recognizes that special treatment may be given to the situation where ostensibly separate apartments are in fact being used as a single unit. However, that case involved the validity of a search warrant covering an entire apartment building and dealt with the probable cause necessary to support a search of more than one apartment in that building. The warrant in Hinton was held to be too broad; the warrant here was obviously not broad enough, in view of the ultimate developments
 
 
 
 15
 DANAHER, Circuit Judge (dissenting).
 
 
 16
 We are concerned here with the question of whether or not money, numbers slips, betting records, adding machines and other such equipment utilized in a gambling enterprise were lawfully seized when the appellants were arrested on July 10, 1959. The appellants have not challenged either the sufficiency or the form of the search warrant authorizing officers to search 1106-18th Street, N. W., or warrants commanding the arrest of the various appellants.[1] No question was presented as to the U. S. Commissioner's determination of the existence of "probable cause," indeed it would appear from the record that none could be.
 
 
 17
 Appellants had sought to suppress the use of the evidence in the hands of the Government, but after hearing and argument, the trial judge denied their motion. At trial, appellants renewed their motion which was again denied, and appellants were convicted. The record shows that these appellants were conducting a gambling establishment on an extensive scale. Some 73 numbers sellers were employed, and for a single day more than 2,000 slips had been written representing bets which totaled $3,198.29. In some factual aspects, the case is much like Beard v. United States,[2] where the officers broke into a gambling house and apprehended Beard and various co-defendants then actually engaged in the operation of their illegal enterprise.
 
 
 18
 "The premises were a secret rendezvous or hideout for illegal activities * * *."[3]
 
 
 19
 Appellants were not in a dwelling, despite the outward appearance of the building. No one lived there, as counsel at the bar was bound to concede. On the contrary, the officers here arrested the appellants in the headquarters of the criminal operations. They made no general exploratory search. The men were seated around their tables and their equipment, processing the numbers bets. The evidence seized by the police was right there on those tables in plain view. "The right to search an arrested person and to take the stuff on top of the desk at which he sits has a justification of necessity which does not eat away the great principle of the Fourth Amendment."[4]
 
 
 20
 In my view this case presents a complete "justification of necessity," not only because the police took only the fruits of the crime, spread out before their very eyes, but "to avoid destruction of evidence by the arrested person. * * * From this it follows that officers may search and seize not only the things physically on the person arrested, but those within his immediate physical control."[5] Accordingly, I would sustain the trial judge in view of the circumstances[6] which follow.
 
 
 21
 After extended surveillance of the conduct of certain of the accused, said to be involved in the "numbers game," the police finally tracked the appellants to premises at 1106-18th Street, N. W., one of a series of row-type houses. The evidence was submitted to the United States Commissioner who determined on July 10, 1959, that probable cause had been established, not only for a search warrant to search No. 1106 but to justify warrants of arrest. That afternoon one of the accused was seen to approach and enter the front door at 1106. Some 15 to 20 minutes later a second of the accused did likewise. After a comparable interval a third man entered. The trial judge fairly might conclude in the light of such conduct and of all the evidence developed, that to arrest any one of the men might well have led to a warning to others who might be part of the ring. It might well have seemed to the trier eminently desirable that the accused be apprehended in a group in the very act of conducting their illicit enterprise. At the very least, experienced officers assigned to the morals squad might well conclude that as each man had been carrying a brown manila folder or similar package, they intended to meet among themselves, and possibly with others as yet unknown to the police, there to determine the winners and to arrange to pay off the bets. Finally a lieutenant of police appeared who had the warrants. Officers then entered the common hallway of 1106 and knocked on the door of apartment No. 1. They identified themselves to a woman who opened the door. In seeking the accused, the officers made a search of the lower floors of the house, but found none of them. From the hallway a door led to the apartment on the second floor. The police knocked, announced their identity, and their purpose as they demanded admittance, but met with no response. Only then did they force a door panel, unlock the door and mount the stairway. A search of the second floor disclosed none of the accused although, obviously, several had been seen to enter a short time earlier. Officers at the rear of the building had seen no one leave.
 
 
 22
 Further examination disclosed a rear porch which had been "blinded" by cloth panels. The appellants had fashioned a veritable conduit, like a tunnel or closed passageway, leading from the hallway of 1106, up the stairs, through the "blinded" porch to the scene of their operations. Nearby on the porch were some carpenter tools next to a doorway which had recently been cut into a flimsy wall of the closed-in porch. It was not unreasonable to conclude that by obviously purposeful ruse, the appellants had utilized 1106 for no other purpose than to cloak their operations. Through the use of that doorway they had simply combined their apartment at 1106 into a single unit when joined with 1108, next door. If appellants had laid down a trail of yarn to their hideout, their course could not have been more obvious.
 
 
 23
 Yet, only by the lawful use of the warrant to search 1106 could the police have discovered and followed the trail. Obviously, had the police known that the appellants had made 1108 — and not 1106 — their headquarters, the police might lawfully at the front door of 1108 have done precisely what they did do. The Supreme Court in Miller v. United States, 1958, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed. 2d 1332, considered the case where a dwelling was forcibly entered by officers who without a warrant of any kind, at three o'clock in the morning, had invaded the living quarters of the appellants. The Court decided that inadequate warning had been given of their purpose before the officers broke open a door. Even under such circumstances, the majority opinion observed: "A few more words by the officers would have satisfied the requirement in this case." Id., 357 U.S. at pages 309-310, 78 S.Ct. at page 1196. In the instant case more than the "few more words by the officers" were spoken.
 
 
 24
 At the doorway on the second floor porch at 1108, the officers observed that panel drapes had been installed. The drapes were not quite closed. Peering within, the officers found the appellants inside seated at their tables, processing numbers bets, with numbers slips before them. They were utilizing adding machines and other equipment, all within sight of the officers. The police again called out. They identified themselves. They stated that they had warrants for the arrest of specifically named appellants on charges of violation of the gambling laws. They demanded admittance. Instead of opening the door, the appellants jumped up and commenced to run in the opposite direction. Thereupon the police forced the door, entered, arrested the appellants and took possession of the evidence which the appellants had been using.
 
 
 25
 The officers made no other search. They seized no other evidence. They took only the instrumentalities of the offense. I need not rest upon whether or not there had been a "reasonable" search within the rule announced by the majority in United States v. Rabinowitz, supra note 4, for there was no search. I need not rest upon whether or not there was time to procure a search warrant. He is naive, indeed, who would suppose that numbers operators such as these would complacently preserve the evidence of their mutual complicity. We did not have here a question of mere "reasonable" grounds for police action without a warrant.[7] These officers had already submitted their case to the magistrate. He had determined that the appellants should be arrested. If the police used the "conduit" from 1106 to 1108 as an entranceway, it was no more than the appellants themselves had made it. It was their passageway. The elusive tactics adopted by these appellants had already proved so successful that the police, despite their earlier surveillance, had no knowledge that the premises at 1108 were their real objective or that the accused had there hidden out. The police did no more than follow what was, in effect, a continuous corridor, which comprised a single unit contrived by these appellants, not only to gain access to their own quarters, but as a means of egress and escape if entrance had been sought at the street door of 1108.
 
 
 26
 Here the police lawfully entered according to the search warrant and thereafter acted pursuant to the arrest warrants. They identified themselves and announced their purpose. They uttered the "few more words." In my view, these officers engaged in daily battle with the criminal elements violated no Fourth Amendment rights. I think the evidence of crime was competent and was properly received. I would affirm.
 
 
 
 Notes:
 
 
 [1]
 The officers had no arrest warrant for appellant Kaufman. However if the evidence was competent as to the other appellants, it applied equally to Kaufman. See Wyche v. United States, 1951, 90 U.S.App.D.C. 67, 193 F.2d 703, certiorari denied 1952, 342 U.S. 943, 72 S.Ct. 556, 96 L.Ed. 702
 
 
 [2]
 1936, 65 App.D.C. 231, 82 F.2d 837, certiorari denied 298 U.S. 655, 56 S.Ct. 675, 80 L.Ed. 1382
 
 
 [3]
 Cf. Wyche v. United States, supra note 1, 90 U.S.App.D.C. at page 69, 193 F. 2d at page 705
 
 
 [4]
 Mr. Justice Frankfurter, dissenting, United States v. Rabinowitz, 1950, 339 U.S. 56, 79, 70 S.Ct. 430, 441, 94 L.Ed. 653; and, of course, under the majority view in Rabinowitz, the evidence was lawfully seized as an incident of a lawful arrest, 339 U.S. at pages 60, 65, 70 S.Ct. at pages 432, 435. Apart from the arrest warrant, the officers had probable cause to believe that a felony was in progress. Smith v. United States, 1958, 103 U.S.App.D.C. 48, 254 F.2d 751, certiorari denied 357 U.S. 937, 78 S.Ct. 1388, 2 L.Ed.2d 1552
 
 
 [5]
 Id., 339 U.S. at page 72, 70 S.Ct. at page 438. The officers took from each of several appellants, keys to the premises
 
 
 [6]
 After hearing and argument on the motion to suppress Judge Holtzoff in ruling remarked: "We have been presented in this case a subterfuge, an insidious plot and scheme to evade the police and put the police off the defendants' trail. The law, indeed, would be both absurd and impotent if such a scheme were permitted to succeed."
 
 
 [7]
 Cf. Bell v. United States, 1958, 102 U.S. App.D.C. 383, 254 F.2d 82, certiorari denied 358 U.S. 885, 79 S.Ct. 126, 3 L.Ed. 2d 113; Trupiano v. United States, 1948, 334 U.S. 699, 708, 68 S.Ct. 1229, 92 L. Ed. 1663. (Nor, as to the latter case need we dwell upon the nuances as expounded in the various opinions in United States v. Rabinowitz and cases cited, supra note 4.)