The UNITED STATES of America,
Plaintiff,

v.

Harold L. DAVIS, Defendant.

Crim. No. 7139.

United States District Court,
S. D. Illinois, S. D.

July 17, 1972.

Donald B. Mackay, U. S. Atty., Springfield, Ill., for the United States.

Donald A. Morgan, Davis, Morgan & Witherell, Peoria, Ill., for defendant.

## OPINION OF THE COURT

POOS, Chief Judge.

This cause comes before the Court on the Motions of the Defendant, Harold L. Davis, for the Return of Property and to Suppress Evidence.

On July 24, 1971 at approximately 10:00 A.M., four agents of the Department of Treasury, Alcohol, Tobacco & Firearms Division went to the home of the Defendant at 519 East Highpoint Road, Peoria, Illinois, with warrants to arrest the Defendant and to search the Defendant's premises. There is a conflict of testimony as to the execution of the search warrant.

Marjorie Eckhoff testified on behalf of the defense and stated that she is a college student and was cleaning house for the Defendant on the date of the search. She testified that while placing dishes into a dishwasher she noticed unfamiliar cars in Defendant's driveway with no one in them. She became concerned and walked to the entrance way which faces the front of the house adjacent to the kitchen window, and saw an Alcohol, Tobacco & Firearms agent (hereinafter "ATF agent") with the door open coming into the house. Once he was in the house the ATF agent identified himself and explained his presence. She further testified that there are two doors in the front entrance of Defendant's residence: one large wooden door, and one glass storm door. The large wooden door was opened, and the storm door had been closed prior to the ATF agent's entrance. She testified that there was no radio playing or any other distracting noise which would prevent her from hearing any knock on the door. After the ATF agent explained his purpose, Miss Eckhoff pointed out that the Defendant was not at home and summoned Defendant's son. He, in turn, called the Defendant on the telephone and Mr. Dytrych, the first ATF agent into the house, spoke to the Defendant. In the meantime, three additional ATF agents entered the house and the Defendant's son asked them to come into the living room and wait for the Defendant to arrive.

ATF agent, Joseph Slater, testified that he took part in the search with agents Donnley, Herbert and Dytrych. Slater and Dytrych went to the front door and Dytrych rang the doorbell. There was no response so Dytrych knocked on the door and Miss Eckhoff answered. The agents had their badges on the outside of their coats, and identi-

fied themselves while standing on the front steps as Miss Eckhoff held the door open.

Slater testified that there was only one door in the front entrance of defendant's residence. He described this door as being a heavy wooden door with glass panels and that the door was closed. Notwithstanding his testimony concerning the door and the entry of the agents, his testimony is substantiated by Miss Eckhoff and the three other ATF agents. That is, that he and agent Dytrych came into the house as Miss Eckhoff summoned Mike Davis. Dytrych spoke to the Defendant on the telephone and all four ATF agents waited for the Defendant to arrive in the Defendant's living room. On cross-examination agent Slater wasn't positive that Dytrych rang a doorbell, but Dytrych did use a knocker which was in the middle of the door about head high. Slater testified that there were double doors, i. e., two doors that meet each other in the same opening. Slater later changed his testimony and said that Dytrych knocked with his hand—not a knocker. He specifically pointed out that the door did not have a single large square glass panel, but he did describe the door as having frosted glass panels throughout, and that you could not see through these glass panels.

Agent Peter Donnley was also at the scene on July 24, 1971. He was stationed at the far corner of Defendant's house approximately fifty feet from the front door. He testified that the front heavy wooden door was closed, that Dytrych knocked on the door, that a young girl answered and Dytrych and Slater walked into the house. Donnley later entered the house when Dytrych was on the telephone. Donnley then took pictures of the entrance to Defendant's house which were marked Government Exhibits 1 and 2. After examining these Exhibits Donnley described the front entrance way to Defendant's home. He stated that his testimony was not based on the Exhibits, but rather on what he saw on July 24, 1971. He de-

scribed the door as a large wooden door with a wooden cross-beam with four window panels of glass. He stated that there was no storm door and that Dytrych rapped on the glass, not the wood.

Agent Peter Dytrych testified that he, along with Slater, went up to the front door which he described as a heavy wooden door, with some type of cross-beam. There was no storm door and Exhibits 1 and 2 accurately depicts Defendant's front door. He knocked on the wooden panel and then on the glass before the girl answered.

On cross-examination Dytrych stated that he examined Exhibits 1 and 2 before the hearing, and that his testimony is based on these pictures. He further stated that the door had a mullion on it with four panes of glass.

Agent Victor Herbert also took part in the search but did not recall anything concerning Defendant's front door. He did state however that while in Defendant's living room he noticed that one side of the living room is glass overlooking the Illinois River.

The Defendant, on rebuttal, testified that he lived at this address for eight years. He described his front entrance way as having two doors. The inner door was a large solid oak door with a small window approximately seven feet above the ground floor. The outer door was a storm door with one large pane of glass. The Defendant examined Exhibit 1 and described the picture. The large wooden door is open and out of the picture. The storm door is closed and the picture portrays a view looking through the glass storm door and through to the back side of Defendant's house. The cross-beams shown in the picture, the Defendant stated, was not part of the door but rather a part of the back glass wall of his home.

Miss Eckhoff again testified and described Exhibit 1 as the large wooden door being open and the storm glass door being closed. She identified the cross-beams as being on the rear window which is the living room directly behind

the front entrance of Defendant's residence.

The remaining testimony points out that after waiting approximately forty-five minutes in the living room, the defendant, his attorney and father-in-law arrived and the ATF agents then conducted their search and seized numerous guns in addition to books, records and documents pertaining to firearm transactions. On July 26, 1971 agent Herbert, along with an Assistant United States Attorney, went to Magistrate Ghiglieri of the Northern Division of the Southern District of Illinois, and presented an affidavit in order to obtain a search warrant for another search of the Defendant's home. Agent Herbert did not swear to the affidavit however Magistrate Ghiglieri dated the affidavit, indicated that it was denied, and signed the affidavit. A record of this action was filed with the Clerk of this Court on August 11, 1971. On July 27, 1971, Agent Herbert, along with the United States Attorney, went to Magistrate Giffin in the Southern Division of the Southern District of Illinois with the same affidavit which had been presented to Magistrate Ghiglieri. Although there is no testimony dealing with this aspect, the United States Attorney did point out that Magistrate Giffin was apprised of the entire proceedings on July 24, 1971 at the residence of the Defendant and of the proceedings before Magistrate Ghiglieri on July 26, 1971. Magistrate Giffin then issued a warrant for a further search of the Defendant's premises and approximately ninety additional guns were taken from the Defendant's premises.

 The first question to determine is under what authority the Government is acting in seizing the Defendant's books, records and guns. Defendant argues that the Government must establish its right to search and seize under the authority by which it is acting. The Government chose to proceed by means of a search warrant and it must be bound by the procedure enunciated in Rule 41 of the Federal Rules of Criminal Procedure. The Government argues that the Defendant was afforded an additional protection since the Government proceeded by means of a search warrant. The Government argues that it could have inspected the Defendant's business premises during business hours as part of the inspection procedure authorized by Section 923(g) of the Gun Control Act of 1968 without obtaining a search warrant. The Government further contends that since the Defendant was afforded the additional protection of having a search warrant issued when in fact his Firearms Transaction Records were subject to inspection without the issuance of a search warrant in the first place, he cannot now complain. Apparently the Government is arguing that even if the procedure utilized in obtaining and executing the search warrant is invalid, the seizure must be upheld since it could have inspected and seized Defendant's guns and records pursuant to Section 923(g) of the Gun Control Act of 1968. The Government's argument fails on two grounds. First, since the Government chose to proceed by means of a search warrant, it cannot now alter this procedure and essentially say that it could have done the same thing by means of another procedure. The point is, the Government chose to proceed by means of a search warrant and it must establish its right to search and seize under the authority by which it was acting. Secondly, if the Government had proceeded under the statutory inspection procedure pursuant to Section 923(g) of the Gun Control Act of 1968, the inspection must occur during the Defendant's business hours. Although no evidence has been adduced as to the Defendant's business hours, it is rather apparent that the Defendant was not open for business at 10:00 A.M. on Saturday, July 24, 1971, inasmuch as the Defendant was at the Country Club playing golf. It necessarily follows that if the Government did proceed under the statutory inspection procedure, the seizure would fail inasmuch as the inspection

did not take place during Defendant's business hours.

Having determined that the Government must establish its authority to search and seize by means of the search warrant, questions arise as to the propriety of the issuance of the search warrant and as to the execution thereof.

■ Defendant contends that probable cause does not exist to permit the search and seizure of the Defendant's premises on July 24, 1971. The basis for this contention, he alleges, is that the alleged violations in the affidavit of ATF Agent David Krug which took place at a Peoria Gun Show on May 15 and 16, 1971 were too remote in time to give probable cause for a search on July 24, 1971.

■ Defendant argues that the reference in David Krug's affidavit to a sale to Ronald Backer is not credible because it is hearsay by an informer, and no one has attested to his reliability. I do not believe that Mr. Backer is an informer inasmuch as he executed an affidavit before the Magistrate, and the Magistrate had the opportunity to determine Mr. Backer's credibility. The defendant cites Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958), Aguilar v. Texas, 375 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). These cases are distinguishable since the informants in those cases were unknown and the Magistrate had no opportunity to determine their credibility. Mr. Backer's affidavit must be considered in determining whether or not sufficient probable cause exists to support a search warrant for the search of Defendant's premises.

The affidavit of David Krug stated that the Defendant had been issued a Federal Firearms Dealer's License, and that license restricted all firearms transactions to Defendant's place of business at 519 Highpoint Road, Peoria, Illinois. That Edward Gleba purchased, on May 16, 1971, a .22 Caliber Smith & Wesson escort pistol from an employee of the Defendant at the Peoria Gun Show which was away from Defendant's premises. That Joe Slater, on May 15, 1971, purchased a Smith & Wesson bodyguard Model .38 Caliber two-inch revolver from the Defendant at the Peoria Gun Show and that the Defendant knew that Mr. Slater did not possess an Illinois Firearm Owners Identification Card. The affidavit concludes by stating that these two sales establish probable cause to believe that the Defendant's premises is being used to store and conceal firearms, books and records pertaining to firearms transactions which are intended for use, or are being used as the means of violating Section 922(a) (1), Title 18, U.S.C.

The affidavit of Ronald Backer states that he is a licensed firearm dealer and that on May 15, 1971 he purchased from the Defendant a Smith & Wesson .357 Magnum Caliber revolver at the Peoria Gun Show. That the Defendant stated to the affiant that the papers would be made out to John Doe. The affiant was not asked to produce an Illinois Firearms Owner Identification card or a Federal Firearms Dealers License, nor did the Defendant make any record or execute any forms dealing with the transfer. That on May 19, 1971 the affiant was advised by the Defendant that the purchase of the .357 Magnum had been written up to an individual in Fairfield, Illinois. That on July 19, 1971 the affiant was present at the Defendant's residence when the Defendant exhibited four Winchester rifles and five new Smith & Wesson revolvers and asked the affiant if he were interested in these guns. Affiant purchased a Model 36 Smith & Wesson Chief's Special and stated that he would be interested in purchasing about six more on July 24, 1971. That the Defendant asked the affiant if he wanted to handle the transfer of the gun on his Federal Firearms License, his Illinois Gun Owners Card, or a John Doe. That the Defendant and affiant agreed to use the name Edward Wren for the transfer. On the basis of the foregoing the affiant alleges that

probable cause exists to believe that the Defendant's premises is being used to store and conceal firearms, books and records pertaining to firearms transactions which are intended for use or are being used as the means of violating Section 922(a) (1) of Title 18, U.S.C.

On the basis of these affidavits the Government contends that all firearms described in Title I of the Gun Control Act of 1968 (Title 18, U.S.C., Chap. 44, Sec. 921), and all books, records and documents pertaining to firearms transactions are being held and/or offered for sale in violation of Section 922, Title 18, U.S.C. by the Defendant, and that there is probable cause to search and seize all these items.

■ Probable cause means more than a mere suspicion, but less than evidence that would justify conviction. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The classic definition of probable cause is found in Brinegar v. United States, 338 U.S. 176, 69 S.Ct. 1311:

> "These long prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, non-technical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

■ The affidavits and search warrant must be interpreted in a common sense and realistic fashion. See United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684. In analyzing the affidavits of Mr. Krug and Mr. Backer in addition to the search warrant, I find that probable cause does exist to seize the books, documents and records of the defendant in addition to the four Winchester rifles and five Smith & Wesson revolvers. To say that probable cause exists to search and seize anything other than the items hereinabove mentioned would be illogical and highy improper.

The defendant is a licensed dealer and he has the legal right to sell firearms lawfully to persons entitled to purchase them. In relation to the Defendant's stock, the Government has shown a very small number of allegedly illegal sales. Three of the illegal sales that were mentioned by the Government took place at the Peoria Gun Show. One took place at the Defendant's residence, and nine other guns were allegedly offered for sale by the Defendant illegally. It would strain the fabric of law beyond reason to say that because of these transactions probable cause exists to search and seize all of the Defendant's gun stock. The Government's position appears to be that since the Defendant has allegedly made some illegal sales, he intends to sell the remaining portion of his gun stock illegally. This is not a rational conclusion. The Government is reasoning from a specific situation dealing with a small number of guns to a general situation dealing with Defendant's entire stock without a substantial basis. Accordingly, I find no probable cause to search and seize anything other than Defendant's books, records and documents relating to firearms transactions and the four Winchester rifles and five Smith & Wesson revolvers. All other items seized in this search must be suppressed.

■ Notwithstanding the fact that probable cause does exist for the above mentioned items, there is a problem with the execution of the search warrant. As pointed out earlier, there is

a conflict in testimony between the various ATF agents and the two defense witnesses, namely the Defendant and Miss Eckhoff.

It is apparent that agents Slater, Donnley and Dytrych had examined Government Exhibits 1 and 2 prior to the hearing and attempted to tailor their testimony as to the portrayal of the Defendant's premises in these pictures. Each described the door to Defendant's front entrance as having frosted panes of glass throughout the door. With a quick glance of Exhibits 1 and 2 this would appear to be correct. However, the testimony of the Defendant and Miss Eckhoff, who is a disinterested third party, reveals that the front entrance to the Defendant's premises at 519 Highpoint Road, Peoria, Illinois, has two doors, a glass storm door and a large wooden door with one pane of glass in it near the top of the door. What Exhibit 1 and 2 portrays is not a large wooden door with glass panels. It portrays a view looking directly into the front entrance of Defendant's premises with the glass storm door closed and the large wooden door opened out of the picture. The glass panes described by the agents as being part of the door is in fact the rear picture window of Defendant's living room overlooking the Illinois River. This is substantiated by agent Herbert's testimony that while sitting in the living room waiting for the Defendant to arrive, he observed a large picture window overlooking a river.

■ I accept and adopt as my Findings of Fact the testimony of the Defendant and Miss Eckhoff. Namely that the large wooden door was open and the storm door closed, and that agent Dytrych entered the Defendant's premises without prior announcement of authority and purpose. Title 18 U.S.C., Section 3109 states:

"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant if, after notice of his authority and purpose he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

In Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968), the Court stated:

"An unannounced intrusion into a dwelling—what § 3109 basically proscribes—is no less an unannounced intrusion whether officers break down a door, force open a chain lock on a partially open door, open a locked door by use of a passkey, or, as here, open a closed but unlocked door. The protection afforded by, and the values inherent in § 3109 must be 'governed by something more than the fortuitous circumstance of an unlocked door.'" Keiningham v. United States, 109 U. S.App.D.C. 272, 276, 287 F.2d 126, 130 (1960).

If an officer breaks in without announcing who he is, and by what authority he is entering, the invalid execution of the warrant will require that any evidence obtained from this search must be suppressed. Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); United States v. Mullin, 329 F. 2d 295 (4th Cir. 1964); Keiningham v. United States, 109 U.S.App.D.C. 272, 287 F.2d 126 (1960).

In applying the Sabbath case to the facts in this matter, it is apparent that the action of the ATF agent in the entry of Defendant's premises without a prior announcement of authority or purpose is clearly in violation of Title 18, U. S.C., Section 3109. Such conduct is clearly illegal and this improper entry renders the subsequent search invalid. As a result thereof, Defendant's books, records and documents pertaining to firearms transactions and the four Winchester rifles and five Smith & Wesson revolvers must be suppressed. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948).

■ On July 27, 1971 the Defendant had his premises searched again. The

search warrant was based upon the affidavit of Mr. Herbert. In it he stated that while in the Defendant's premises on July 24, 1971 during the first search of the Defendant's premises, he noticed approximately 500 assorted long guns and hand guns and heard the Defendant say that 350 of these guns were his personal property. That he was present when only those guns were seized which were not classified as the Defendant's personal property. The affiant reiterated the other sales mentioned in the affidavits for the first search warrant. This second search necessarily fails for three reasons.

Since I have determined that the first search and seizure of the Defendant's premises was illegal, and that all evidence obtained therefrom must be suppressed, it necessarily follows that any information obtained from such illegal search must also be suppressed. Silverthorne Lumber Company v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L. Ed. 319 (1920); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963). Since the information in the affidavit upon which the second search warrant is based was obtained during the first search, the second search is subsequently rendered invalid.

Secondly, I regard the procedure in which the second search warrant was obtained as highly improper. After Magistrate Ghiglieri refused to authorize another search of the Defendant's premises, the Government went to Magistrate Giffin with the identical affidavit. The Government merely inked out Magistrate Ghiglieri's name and the Northern Division and inserted Magistrate Giffin's name along with Southern Division. Magistrate Giffin was apprised of the fact that this same affidavit was presented to Magistrate Ghiglieri and that he had denied it. The Government argues that nothing was in fact presented to Magistrate Ghiglieri upon which he could have acted. The only thing presented to Magistrate Ghiglieri on July 26, 1971 was a proposed affidavit of

agent Herbert and that this affidavit was never executed or sworn to before Magistrate Ghiglieri. Consequently the notation made by Magistrate Ghiglieri on the bottom of the affidavit to the effect that the motion was denied is meaningless since nothing had been formally presented to the Magistrate. This argument is clearly without merit. It is apparent that the reason the affidavit was not executed or sworn to was because Magistrate Ghiglieri had decided that he was not going to issue another search warrant before the agent had an opportunity to execute and swear to the affidavit. The decision by Magistrate Ghiglieri was a judicial decision. Jaben v. United States, 381 U.S. 214, 224, 85 S. Ct. 1365, 14 L.Ed.2d 345 (1965); Biondo v. United States, 348 F.2d 272, 274 (8th Cir. 1965); United States v. Romano, 241 F.Supp. 933, 937 (S.D. Maine 1965), and the fact that the affidavit was not sworn to or executed is of no consequence. Magistrate Ghiglieri's decision was final and binding. Tidewater Oil Company v. Jackson, 320 F.2d 157, 161 (10th Cir. 1963); Landreth v. Wabash Railroad Company, 153 F.2d 98 (7th Cir. 1946), and his denial of the application for a second search equitably estopped Magistrate Giffin from issuing a search warrant on the exact same showing.

Probable cause is also a defect in this second search. As I have stated hereinbefore, probable cause does exist to seize Defendant's books, records and documents pertaining to firearms transactions and the four Winchester rifles and five Smith & Wesson revolvers, but to say probable cause exists to seize any other guns would be unreasonable. The probable cause discussion mentioned in dealing with the first search warrant is also applicable to the second search warrant.

In light of the foregoing reasons, I find that the second search of the Defendant's premises is illegal and that the items seized therein must be suppressed.

██ Defendant also moves for a return of all property seized from his

premises on July 24, 1971 and July 27, 1971. None of the items involved in the search are contraband as in United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951), and Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948). The illegally imported narcotics in Jeffers and the unregistered still, alcohol and mash in Trupiano were contraband per se and possession of these items, without more, constituted a crime. The return of the contraband would clearly have frustrated the express public policy against the possession of such objects. See United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951).

It is apparent that the nature of the property here is quite different from that in Jeffers and Trupiano. The possession of guns not prohibited by the Gun Control Act of 1968, Title 18, U.S. C., Section 921, and of books, records and documents pertaining to firearms transactions is not criminal per se.

Accordingly, all guns, books, records and documents pertaining to firearm transactions seized from the Defendant must be returned. See One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965).