**UNITED STATES of America,**

v.

**Stanley Seymour PALMER, Stephenson Alexander Price et al, Defendants.**

**Nos. CR–80–137–01–S, CR–80–137–02–S.**

United States District Court, M. D. North Carolina, Salisbury Division.

Jan. 2, 1981.

U. S. Atty. H. M. Michaux, Jr. by Asst. U. S. Atty. Douglas Cannon, Greensboro, N. C., for the Government.

William L. Cofer, Eddie C. Mitchell, Winston-Salem, N. C., for defendants.

## MEMORANDUM AND ORDER

ERWIN, District Judge.

This case was noticed for hearing on December 2, 1980, in the United States Courtroom in Winston-Salem, North Carolina. Pursuant to such notice, the motions of defendants Stanley Seymour Palmer and Stephenson Alexander Price to suppress evidence seized pursuant to an allegedly illegal search were heard by the Court. William L. Cofer and Eddie C. Mitchell argued the respective motions to suppress of defendants Palmer and Price; Douglas Cannon appeared on behalf of the Government. Based on the briefs filed by the parties, the testimony and exhibits adduced at the hearing, and other evidence appearing of record, the Court concludes that the motions to suppress of defendants Palmer and Price should be granted.

### Background

Seven defendants, including defendants Palmer and Price, were indicted on October 27, 1980. Counts One, Two, and Three of the fourteen-count indictment charge Palmer and Price with violations of Title 18

United States Code, Sections 1955,[1] 1084(a),[2] and 1952(a)(3)[3] respectively.

Defendant Palmer is the owner of a bar located in Winston-Salem, North Carolina and resides at 163 Charlestowne Circle, Winston-Salem, North Carolina. Defendant Price resides at Route 5, Shoaf Road, also in Winston-Salem, and is the owner and operator of Stereo City, a retail stereo equipment store, on Peters Creek Parkway in Winston-Salem.

In an affidavit made on December 14, 1980 before United States Magistrate Herman A. Smith, FBI Special Agent William T. Schatzman testified that information developed by the FBI tended to show that defendants Palmer and Price were conduct-

1. § 1955. Prohibition of illegal gambling businesses

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.

(d) Any property, including money, used in violation of the provisions of this section may be seized and forfeited to the United States. All provisions of law relating to the seizures, summary, and judicial forfeiture procedures, and condemnation of vessels, vehicles, merchandise, and baggage for violation of the customs laws; the disposition of such vessels, vehicles, merchandise, and baggage or the proceeds from such sale; the remission or mitigation of such forfeitures; and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to seizures and forfeitures incurred or alleged to have been incurred under the provisions of this section, insofar as applicable and not inconsistent with such provisions. Such duties as are imposed upon the collector of customs or any other person in respect to the seizure and forfeiture of vessels, vehicles, merchandise, and baggage under the customs laws shall be performed with respect to seizures and forfeitures of property used or intended for use in violation of this section by such officers, agents, or other persons as may be designated for that purpose by the Attorney General.

(e) This section shall not apply to any bingo game, lottery, or similar game of chance conducted by an organization exempt from tax under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code of 1954, as amended, if no part of the gross receipts derived from such activity inures to the benefit of any private shareholder, member, or employee of such organization except as compensation for actual expenses incurred by him in the conduct of such activity.

2. § 1084. Transmission of wagering information; penalties

(a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

3. § 1952. Interstate and foreign travel or transportation in aid of racketeering enterprises

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

ing an illegal bookmaking business from the premises known as Carl's Carpet Mart, Inc., New Lexington Road, Route 11, Box 246, Winston-Salem, North Carolina. Agent Schatzman testified further that the foregoing information gave rise to reason to believe that concealed on the persons of defendants Palmer and Price, and on the premises of Carl's Carpet Mart, Inc. was certain property including, *inter alia*, books, ledgers, betting slips, and sport results information which was being maintained in the conduct of an alleged gambling business.

Based on the affidavit testimony of Agent Schatzman, warrants were issued on December 14, 1980 authorizing the search of the person of defendant Stanley Seymour Palmer (see Defendant's Exhibit 6) and the person of defendant Stephenson Alexander Price and the premises known as Carl's Carpet Mart, Inc. (see Defendants' Exhibit 5). The warrants also authorized the seizure of certain described property believed to have been maintained in furtherance of the alleged illegal gambling activities. The warrants were executed on December 16, 1979. At that time, special agents of the FBI seized from the persons of defendants Price and Palmer, and from the premises of two adjoining offices in the rear of an area adjacent to Carl's Carpet Mart, Inc., items deemed to have been used in furtherance of the alleged illegal activity.[4] It is these items which Palmer and Price seek to suppress.

*Hearing*

At the hearing, defendants offered the testimony of R. Wayne Sink, a part owner and manager of Carl's Carpet Mart, Inc. (hereinafter Carl's or Area "A"). Sink testified that the land upon which the shopping center in question is located is owned by his father, Raford Sink, and his uncle, Raymond Sink. Sink went on to say that on December 16, 1979, Carl's Carpet Mart, Inc. conducted its carpet sales and installation business from premises situated in the northernmost section of a L-shaped shopping center located on New Lexington Road in Davidson County, North Carolina. He stated that Carl's Carpet Mart is adjacent to but not connected with the actual location searched. Sink identified a diagram[5] as representing the general configuration of the stores in the shopping center as they appeared on December 16, 1979. Sink identified Area "A" of that diagram as representing Carl's Carpet Mart, Inc., and Area "B" of the diagram, the area actually searched, as that area most recently occupied by the Miller-Arrington appliance store. He testified that at the time of the search, the Miller-Arrington business had ceased operations, but Lacey Miller, the tenant in Area "B", had continued to use the front of the area to conduct periodic antique auctions.[6]

Sink testified that Miller paid the rent for Area "B", although for several months prior to the search, the rental payments were actually delivered by one of the defendants. Sink stated that he supplied keys to Area "B" to defendants and that he was present when telephones were installed in the rear offices in Area "B". He stated that the phones were installed under the name Carl's Carpet Mart, Inc. and that charges to those phones were billed to Carl's Carpet Mart, Inc. Sink noted that the telephone bills for Carl's Carpet Mart, Inc. were paid by him and that he would be reimbursed by defendants by that amount of the total bill attributable to the phones in Area "B".

Sink testified that there was no internal access between Carl's Carpet Mart, Inc. and

---

**4.** See Defendants' Exhibits 5 and 6.

**5.** See Defendants' Exhibit 2.

**6.** Sink testified that Miller had conducted perhaps three auctions from Area "B" during the year preceding the search, the last one having been in October 1979. Sink testified that the premises in Area "B" have been kept in a general state of disarray since the Miller-Arrington enterprise discontinued its operations. Sink stated that from the general appearance of Area "B" on the date of the search and for sometime theretofore, it did not appear that the premises were being used in the conduct of an ongoing business enterprise.

Area "B", although from the outside front of Area "B", one could not determine whether the two premises were internally connected or not. Sink testified that a partition which runs parallel to the front of Carl's Carpet Mart separates the showroom area of those premises from washrooms situated in the rear corner of the store. He noted that the washrooms are located in the rear corner of Area "A", which is adjacent to the rear office of Area "B". He stated that this partition prevents an observer from outside Area "A" from ascertaining whether a passageway exists between the washroom section of Area "A" and the rear office section of Area "B".

Sink testified further that a sign located above the store and which extended along the front roof line of Area "A" identified those premises as "Carl's Carpet Mart." He stated that no portion of that sign was over Area "B". He stated further that a glass panel over the entry way to Area "B" contained the printed words, "Miller-Arrington."

The testimony of FBI Special Agent William T. Schatzman was also offered at the suppression hearing. Agent Schatzman testified that he had supervised a surveillance of the shopping center for a period of approximately two months preceding the date of the search. He stated that the surveillance consisted of exterior observations of Areas "A" and "B", and an interior examination of Area "A" conducted by agents posing as customers of Carl's Carpet Mart. Agent Schatzman testified that these observations did not enable him to determine whether there existed an internal passageway which connected Areas "A" and "B".

Agent Schatzman also testified that he was the affiant for the search warrant, and that it was he who, in the company of other agents, executed the warrant on December 16, 1979. He stated that at the time of the execution of the warrants, he and his accompanying agents entered the front part of Area "B" and proceeded directly to the rear offices of that area. Agent Schatzman testified further that the search was confined to the rear office section of Area "B".

He stated that the defendants were in Area "B" at the time of the entry of the agents onto the premises and were searched. He testified further that his search revealed no passageways between Areas "A" and "B". Agent Schatzman also noted that at the time the warrants were executed, Area "B" did have the words, "Miller-Arrington," on the glass panel above the entry way to the premises, although no business appeared to be functioning from the premises at the time.

*Findings of Fact*

From the above, the Court is satisfied that the defendants have established by the preponderance of the evidence the following, and the Court accordingly makes these findings of fact:

1. On December 14, 1979, an extended investigation of alleged illegal gambling activities, reportedly involving, among others, defendants Stanley Seymour Palmer and Stephenson Alexander Price, led agents of the Federal Bureau of Investigation to obtain search warrants authorizing the search of "the premises known as Carl's Carpet Mart, Inc., New Lexington Road, Route 11, Box 246, Winston-Salem, North Carolina" and the search of the two defendants at said premises.

2. At all times involved herein, Carl's Carpet Mart, Inc. occupied and carried on a retail carpet business from the northernmost portion (Area "A" on Defendants' Exhibit 2) of an L-shaped shopping center in Davidson County, North Carolina.

3. Adjacent to Carl's Carpet Mart, Inc. was a space (Area "B" on Defendants' Exhibit 2), the front part of which had been rented to and was used by one Lacey Miller as an appliance store and later an auction site.

4. Defendants Palmer and Price were occupying and using a section of offices across the rear of and partitioned off from the area occupied by Lacey Miller.

5. Two telephones in the rear office section of Area "B" had been installed originally with the permission of R. Wayne Sink,

part owner and manager of Carl's Carpet Mart, Inc. Sink, on behalf of his father and uncle who owned the shopping center property, collected rent payment from Lacey Miller, and later from defendants Palmer and Price.

6. Charges for the subject telephones were billed to Carl's Carpet Mart, Inc. The manager for Carl's Carpet Mart, Inc., after paying the bill each month, was reimbursed by defendants Palmer and Price.

7. A large "Carl's Carpet Mart" sign (see Defendants' Exhibit 3) extended along the northern front roof line of Area "A". A roof framework over Area "B" held no sign, but on a glass panel over the front doors to Area "B" were painted the words, "Miller-Arrington" (see Defendants' Exhibit 4).

8. During the course of FBI surveillance, Palmer and Price were seen on repeated occasions to enter Area "B", usually letting themselves in the double front doors with keys furnished them by the landlord's agent, Sink. Neither Palmer nor Price were ever seen to go in or come out of the doors to any area at the subject shopping center except those at the front of Area "B".

9. An unbroken party wall prevented any interior access between Carl's Carpet Mart and Area "B". Through large windows at the front of Areas "A" and "B", government agents could see most, but not all, of the party walls separating the subject areas.

10. Posing as customers of Carl's Carpet Mart, government agents conducted visual examinations of the interior of those premises. These examinations revealed no internal passageway connecting Carl's Carpet Mart with any part of Area "B". Government agents made no effort to explore the corner bathroom in Carl's Carpet Mart, Inc. which blocked their full view of the party wall between Carl's and the rear offices in Area "B".

11. Having in their possession a search warrant for "Carl's Carpet Mart, Inc.," federal agents on December 16, 1979 entered Area "B". They proceeded to search for and seize items from the chain of offices in the rear of Area "B" and from the persons of Palmer and Price, who were on the premises at the time.

12. The search warrant pursuant to which officers conducted the December 16, 1979 raid did not incorporate by reference the affidavit upon which it was issued. No copy of the affidavit was served on either Palmer or Price.

### Conclusions of Law

In response to defendants' motions to suppress, the Government contends that neither defendant possesses a reasonable expectation of privacy as respects the contents of the offices made the subject of the search and that both defendants are thereby deprived of standing to challenge its legality. It is the apparent position of the Government that defendants were, at best, frequent visitors to the searched premises and, as such, obtained no interest sufficiently possessory in nature as to give rise to a constitutionally protected expectation of privacy. For the reasons which follow, this Court concludes that the defendants have evidenced a relationship to the searched premises which is sufficiently substantial to give defendants a constitutionally protected privacy interest therein, and which gives defendants standing to raise challenges to the constitutional propriety of the search.

The nature of the interest necessary to maintain a motion to suppress was first defined by the United States Supreme Court in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Petitioner in *Jones* occupied an apartment which he testified later was not his but that of a friend who had permitted him to use it. The apartment was entered by federal officers armed with a search warrant, narcotics were found and seized, and petitioner was arrested and charged with violation of federal narcotics laws.[7]

---

7. The defendant in *Jones* was charged in a two-count indictment with violations of 26 U.S.C. § 4704(a) (repealed 1970) prohibiting the

In rejecting the Government's contention that the defendant lacked standing to challenge the search there involved because he could assert no possessory interest in the searched apartment greater than that of a guest or invitee, the Court in *Jones* held that the defendant's presence in the apartment with the consent of the owner demonstrated a sufficient interest in the premises to establish him as a "person aggrieved" by the search. *Id.* at 265, 80 S.Ct. at 733. To this extent, the decision in *Jones* emphasized the view that the primary interest sought to be furthered by the protection of the Fourth Amendment is that of the personal privacy of the individual. It is well settled that this right of privacy is highly personal and may not be asserted vicariously. *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

Although in Jones the Court based the defendant's standing upon his "legitimate presence" on the searched premises, since that time, the development of the law of standing in Fourth Amendment cases has turned on whether the defendant had a "legitimate expectation of privacy" in the searched premises. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Generally, a defendant is deemed to enjoy such an expectation where he or she adduces evidence which tends to show that the area searched is one wherein they might reasonably expect to be free of government intrusion. In the instant case, the record is replete with evidence that defendants Palmer and Price actually used and occupied the subject premises with the knowledge and consent of the landlord's agent. It is clear, for example, that defendants

were present at the time the premises were searched; defendants possessed keys to the offices in question, given to them by the agent of the landlords; defendants periodically delivered the monthly rental payments to the landlord's agent; and defendants regularly reimbursed the owners of Carl's Carpet Mart, Inc. that portion of the telephone bill setting forth charges for telephones located in the rear offices of Area "B". Such a factual setting, when viewed in light of certain photographic government evidence purporting to show how defendants attempted to secure themselves from intruders by installing heavy inside bolts on the doors to the rear offices of Area "B", makes irresistible the conclusion that defendants have proven the existence of a reasonable and legitimate expectation of privacy with respect to the rear offices of Area "B" and their contents and may therefore stand to challenge the legality of the search of those premises.

The Government next contends that the search in question did not run afoul of the constitutional requirement that the search be limited to that area particularly described in the warrant. The Government contends that upon these facts, it was "reasonable" for the agents executing the warrant to believe that the rear offices of Area "B" and the Carl's Carpet Mart premises were being used as a single unit. In support of this position, the Government relies primarily upon the coexistence of two salient factual circumstances. First, they contend that the numbers corresponding to the telephones located in the rear of Area "B" were subscribed to by Carl's Carpet Mart, Inc. Since Carl's apparently subscribed to no other numbers corresponding to telephones located in other areas of the shopping center, save for those installed on its own

purchase, sale, dispensing, or distribution of narcotic drugs except in their original, stamped package, and 21 U.S.C. § 174 (repealed 1970), penalizing, *inter alia*, unexplained possession of narcotic drugs. Unlike the statute here involved, the statutory provisions under which the defendant in *Jones* was prosecuted permitted conviction upon proof of the defendant's possession of certain items of contraband. Al-

though the issue of "automatic standing" addressed by that Court is not here involved, the analysis of *Jones* and its progeny dismissing the contention that a preexisting property interest in the searched premises stands as a prerequisite to a defendant's standing to challenge the legality of a search is highly probative of the issue here presented.

premises, the Government suggests that this practice is indicative of an exercise of dominion over the rear portion of Area "B" by Carl's. Next, the Government notes that at the time of the search, and for a significant period of time theretofore, the front portion of Area "B" appeared to have been effectively abandoned as an ongoing commercial concern. The Government suggests that, when viewed together, these circumstances support the inference drawn by the FBI Agents that the rear of Section "B" was but a part of the business being conducted by the owners of Carl's Carpet Mart, Inc.

█ The Fourth Amendment to the United States Constitution provides, *inter alia*, that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The requirement of particularity of description of the place or places to be searched in search warrants is a principle deeply ingrained in Fourth Amendment jurisprudence and one scrupulously guarded by the courts. *Steele v. United States*, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925); *see also National City Trading Corp. v. United States*, 487 F.Supp. 1332 (S.D.N.Y.1980); *United States v. La-Monte*, 455 F.Supp. 952 (E.D.Pa.1978); *United States v. Miller*, 442 F.Supp. 742 (D.Me.1977); *United States v. Votteller*, 544 F.2d 1355 (6th Cir. 1976); *United States v. Johnson*, 541 F.2d 1311 (8th Cir. 1976); *United States v. Kaye*, 432 F.2d 647 (D.C. Cir.1970).

█ The facts of *United States v. Kaye, supra*, are remarkably similar to those presented in the present case. In *Kaye*, the search warrant authorized the search of a structure identified as "3618 14th Street N.W." and described as "a two-story brick building."[8] The area to be searched consisted of a store operated by the defendant. The warrant did not authorize a search of 3618½ 14th Street, a second-floor residence

with a separate entrance but part of the same building leased in its entirety to the defendant. After an unsuccessful search of the business area and the basement below, the police proceeded to search the residential premises and seized therefrom items of alleged contraband which were later offered as evidence against the defendant. In reversing a denial of defendant's motion to suppress such evidence, the Court held that where the area described in the warrant and the area actually searched are separate and distinct parts of a single structure, the description of the area to be searched set forth in the affidavit supporting the search warrant may not be employed to expand the scope of the authorized search as set forth in the warrant itself. *Id.* at 649. In the instant case, there exists no dispute that the place described in both of the search warrants in question is "Carl's Carpet Mart, Inc., New Lexington Road, Route 11, Box 246, Winston-Salem, North Carolina." The parties are also in agreement that the entirety of the search in question occurred within the offices located in the rear of the area identified by the sign, "Miller-Arrington."

The Government contends, however, that where law enforcement personnel have reasonably thought that the premises to be searched were one unit, and upon executing the warrant discovered otherwise, evidence seized pursuant thereto is not subject to suppression on grounds that the search was unconstitutionally broad in scope. In support of its position, the Government places great reliance upon *United States v. Dorsey*, 591 F.2d 922 (D.C.Cir.1978). *Dorsey* and the cases cited therein involve the factual situation wherein a warrant purports to authorize a search of a particular premises in its entirety where, in fact, probable cause exists only for the search of one or more subunits contained therein. The Court in *Dorsey*, in upholding the validity of the search, held that, in the context of subdivisions of single buildings, the consti-

---

**8.** The description, "a two-story brick building," was contained in the affidavit in support of the search warrant, while the description, "3618 14th Street N.W.," was contained in the search warrant itself.

tutional requirement of particularity of description is satisfied where the warrant contains "as much specificity as police officers with 'practical accuracy' ... may provide." *Id.* at 929. The Government's reliance upon *Dorsey* is undermined, however, by the existence of a significant distinction between the facts of that case and those here involved. In *Dorsey*, there was no indication that the police officers either knew or reasonably should have known that the premises described in the warrant were divided into several subunits. The premises there involved displayed no external evidence of multiple occupancy. In the present case, however, the Government admits that agents of the FBI conducted extensive surveillance of the premises, which surveillance consisted of both external and internal examinations of Carl's Carpet Mart, Inc. (*See* Findings of Fact 8, 9, and 10, *supra.*) The Government also admits that both the Carl's Carpet Mart, Inc. premises and those of Miller-Arrington were identified by signs conspicuously placed on their respective locations. (*See* Findings of Fact 7.)

From the foregoing, it appears that the FBI Agents had ample opportunity to familiarize themselves with the physical configuration of the premises to be searched. It is equally apparent that, having identified the rear offices of Area "B" as the situs of the suspected illegal activity, government agents could have either sought an additional warrant which particularly identified those premises as the area to be searched or included a specific description of the offices in the rear of Area "B" on the warrants actually obtained. In view of the well settled principle that search warrants are to be strictly construed, *Keiningham v. United States*, 287 F.2d 126 (D.C. Cir.1960), this Court is constrained to conclude that the search warrant issued on December 14, 1979 respecting the premises identified as Carl's Carpet Mart, Inc. did not authorize the search which was, in fact, conducted. Such search having been in violation of the Fourth Amendment of the United States Constitution, all evidence obtained thereby should be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).