Steven OPALENIK Jr. and Diane
R. Opalenik, Plaintiffs,

v.

David J. LaBRIE, Mark B. Dominick,
Jess G. Camp, McLair Mailhott, David
S. Bertera, Adam J. Bartlett, Mark
Shlosser, Barry O'Connor, Dennis Hu-
kowicz, Town of Hadley, and Town of
South Hadley, Defendants.

Civil Action No. 11–cv–30065–KPN.

United States District Court,
D. Massachusetts.

March 22, 2013.

Stephen Opalenik, South Hadley, MA, pro se.

Diane Opalenik, South Hadley, MA, pro se.

Andrew J. Gambaccini, Reardon, Joyce & Akerson, P.C., Worcester, Carole Sakowski Lynch, Frederick P. Frangie, Morrison Mahoney, LLP, Springfield, Douglas I. Louison, Stephen C. Pfaff, Louison, Costello, Condon & Pfaff, LLP, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER WITH REGARD TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Document Nos. 84 and 88)

KENNETH P. NEIMAN, United States Magistrate Judge.

Steven Opalenik and Diane Opalenik ("Plaintiffs"), proceeding *pro se*, assert various civil rights and tort claims against the Town of Hadley and certain Hadley police officers ("Hadley Defendants") as well as against the Town of South Hadley and certain South Hadley police officers ("South Hadley Defendants"). The individual Hadley Defendants are David S. Bertera, Adam J. Bartlett, Mark Shlosser, Barry O'Connor and Dennis Hukowicz.[1] The individual South Hadley Defendants

---

1. Mark Ruddock was also a Hadley Defendant, but on January 28, 2013, Plaintiffs voluntarily dismissed their claims against him. (Document No. 101.) Although Plaintiffs' notice of voluntary dismissal stated that they were dismissing Ruddock "without prejudice," they have since clarified that they wish to dismiss him with prejudice.

are David J. LaBrie, Mark B. Dominick, Jess G. Camp, and McLair Mailhott.

Plaintiffs' claims arise from searches and seizures at their property and the subsequent criminal prosecution of Steven Opalenik. Although Steven Opalenik was found guilty of charges in connection therewith, the Massachusetts Appeals Court overturned his conviction because the initial search warrant was not supported by probable cause. *See Commonwealth v. Opalenik,* 76 Mass.App.Ct. 1102, 2009 WL 4842245 (Mass.App.Ct. Dec. 17, 2009) (unpublished). In particular, Plaintiffs assert the following claims in their third amended complaint: civil conspiracy against Bertera, Bartlett, O'Connor, Hukowicz, LaBrie, Dominick, Camp and Mailhott (Count I); illegal search and arrest pursuant to 42 U.S.C. § 1983 against Bertera, Bartlett, O'Connor, Hukowicz, Dominick, LaBrie and Camp (Count II); failure to properly select, train, supervise, and discipline officers pursuant to 42 U.S.C. § 1983 against both the Towns of Hadley and South Hadley (Counts III and IV); Massachusetts Civil Rights Act violations against all Defendants (Count V); malicious prosecution against all Defendants (Count VI); intentional infliction of emotional distress and negligent infliction of emotional distress against all Defendants (Count VII); and defamation against all Defendants (Count VIII).

Presently, both the Hadley Defendants and South Hadley Defendants seek summary judgment on all of Plaintiffs' claims. Pursuant to 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73, the parties have consented to the jurisdiction of this court. For the reasons that follow, the court will allow Defendants' motions in part and deny them in part.

### I. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.,* 331 F.3d 166, 173 (1st Cir.2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank,* 27 F.3d 746, 748 (1st Cir.1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.,* 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Although evidence submitted by *pro se* litigants should be construed liberally, *see Posadas de Puerto Rico, Inc. v. Radin,* 856 F.2d 399, 401 (1st Cir.1988), "*pro se* status does not free a litigant in a civil case of the obligation to comply with procedural rules," *Ruiz Rivera v. Riley,* 209 F.3d 24, 28 n. 2 (1st Cir.2000).

### II. BACKGROUND

The parties do not dispute the following facts, which are construed in a light most favorable to Plaintiffs. On March 10, 2008, Plaintiffs were exploring property located at 425 River Drive in Hadley, Massachusetts, which was owned by Thomas and William Tudryn, along with other Tudryn family members, but had not been occupied since 2002. (Hadley Defendants' Statement of Material Facts ("Hadley SOF") ¶ 2–3; South Hadley Defendants' Statement of Material Facts ("So. Hadley SOF") ¶ 14–16.) Plaintiffs thought the property, which included a house and an

attached garage, was abandoned and wanted to investigate whether it would be a worthwhile investment. (So. Hadley SOF ¶ 14; Hadley SOF ¶ 3; Plaintiffs' Statement of Material Facts ("Pl. SOF") ¶ 1.) They pulled their vehicle into the garage to determine whether it would fit, but the garage only enclosed three-quarters of the vehicle, leaving its rear visible to the street. (So. Hadley SOF ¶ 16; Hadley SOF ¶ 5.) Diane Opalenik grabbed a headlamp from the vehicle's trunk, which she left open. (So. Hadley SOF ¶ 16.) The trunk also contained carpentry tools and a sledge hammer. (Hadley SOF ¶ 6; Pl. SOF ¶ 1.) Plaintiffs then proceeded to inspect the attic area of the garage when Thomas Tudryn, after having been alerted by a family member that there was an unfamiliar vehicle at the property, arrived there. (So. Hadley SOF ¶ 15, 16.)

Upon his arrival, Thomas Tudryn honked his horn and asked a family member to call the Hadley Police Department. (Id. ¶ 15.) William Tudryn arrived shortly thereafter. (Id. ¶ 17.) Diane Opalenik tried to explain to the Tudryns why they were at the property, but Thomas Tudryn told her that she would have to talk with the police. (Id.) Hadley Police Officers Mark Ruddock and Mark Shlosser then arrived and spoke with Plaintiffs. (Id. ¶ 18.) Thereafter, Thomas Tudryn escorted Shlosser through the house, after which Shlosser reported to Ruddock that he saw wet foot-prints leading from the garage through a door leading to the interior of the house. (Pl. SOF ¶ 1.) Thomas Tudryn then showed Ruddock a wooden door on the second floor of the house that was accessible through the attic area of the garage. (Id.) Although the Tudryns stated that the door had previously been nailed shut, the door was open and appeared to have been smashed in with a hammer or crowbar. (So. Hadley SOF ¶ 19.) Ruddock also observed a pile of antique-style property neatly stacked in the kitchen area. (Hadley SOF ¶ 19.)

After exiting the house, Ruddock looked inside Plaintiffs' vehicle and noticed the carpentry tools and sledge hammer but did not see anything belonging to the Tudryns. (So. Hadley SOF ¶ 20; Pl. SOF 1.) The Tudryns were unsure if they wanted Plaintiffs arrested because it appeared as though nothing had been taken from the house. (Id.) Ruddock and Shlosser then advised Plaintiffs that the matter was under investigation and that they could possibly expect a criminal summons in the mail for trespassing. (So. Hadley SOF ¶ 21.) Ruddock and Shlosser also advised the Tudryns that they could complete incident reports after they had a chance to speak with other family members. (Id.)

At 5:06 p.m. that same day, thirty minutes before Ruddock wrote his incident report, a Hadley police officer called the South Hadley police station seeking information about Plaintiffs and informing the South Hadley police that Plaintiffs "are going to town halls to find vacant homes of people who have past [sic] away and have been out of the home for a while. Then they go to the home [to] break in and pull into a garage or somewhere, where they can concile [sic] a vehicle and take antiques and collectable's [sic]." [2] (Pl. SOF ¶ 8; Exhibit 11 (Attached to Pl. SOF).)

**2.** This statement, apparently, was a reference to an incident that occurred in Lee, Massachusetts, also on March 10, 2008. The affidavit attached to the later search warrant application regarding the incident at issue here states: "Officers also received a broadcast from the Massachusetts State Police in Lee, Massachusetts later that evening investigating similar breaking & entering where antiques and old jewelry had been taken. There was also mention of a female suspect involved with the Lee case." (Exhibit 7 (Attached to So. Hadley SOF).)

The next day, March 11, 2008, at 12:06 p.m., before Thomas Tudryn filed an incident report, Hadley Police Officer Adam Bartlett ran a vehicle query on the Opaleniks' vehicle. (Pl. SOF ¶ 8.) Some writing on Bartlett's Query Report states the Opaleniks' vehicle also was followed on March 10, 2008, at 8:00 p.m. (*Id.*)

In any event, during the evening of March 10 or the morning of March 11, 2008, Thomas Tudryn returned to 425 River Drive with his wife. (So. Hadley SOF ¶ 22.; Exhibit 2 (Attached to So. Hadley SOF).) They discovered that china, a phonograph, music records, copper pipe from the cellar, and other items were missing. (Hadley SOF ¶ 22.) On March 11, 2008, that day being certain, Thomas and William Tudryn submitted incident statements to the Hadley Police Department reporting the events of March 10, 2008. (*Id.* ¶ 23; Exhibit F (Attached to Hadley SOF)); Exhibit G (Attached to Hadley SOF).) Thomas Tudryn's statement also reports the items that he and his wife discovered missing upon his return to the property. (Exhibit F (Attached to Hadley SOF.)

Bartlett was assigned to lead the investigation. (*Id.* ¶ 24.) As part of that investigation, Bartlett read reports prepared by Ruddock, spoke with Ruddock and Shlosser, met with Thomas and William Tudryn, and toured and took photographs of the property. (*Id.* ¶ 25; So. Hadley SOF ¶ 25.) Bartlett then drafted an affidavit with the assistance of Hadley Police Officer Bertera and, on March 13, 2008, applied for a warrant to search Plaintiffs' house at 5 Bach Lane in South Hadley. (Hadley SOF ¶ 26; So. Hadley SOF ¶ 27.) The affidavit which was attached to the search warrant application included an addendum describing the property for which Bartlett wished to search; specifically, it described "[a] set of 7 dishes including 5 pieces in each set, PEMBROKE–GOLD TRIM BIRDS AND FLORAL RIM & CENTER, GOLD TRIM," "[v]arious distinctive full records some with the owners initials on them such as Beach Boys, Iron Butterfly, Herman and Hermits, Rose Miller, Paul Revere and the Raiders, Bee Gees, and the Beatles," and "[a] one of a kind Beatles figurine all wearing blue jackets made by the aunt of the victim, it is probable that the aunts [sic] initials are located on the bottom." (Exhibit 7 (Attached to So. Hadley SOF).) Bartlett also attached a photograph of Plaintiffs' house, which shows a fence and two other structures in the background. (So. Hadley SOF ¶ 27; Exhibit 7 (Attached to So. Hadley SOF).)

On March 13, 2008, Assistant Clerk Nancy Flavin of the Eastern Hampshire District Court approved Bartlett's application and issued a search warrant. (So. Hadley SOF ¶ 28.) That same day, Bertera and Bartlett traveled to the South Hadley Police Department and informed Lieutenant William Sowa that they had a warrant to search Plaintiffs' property and requested assistance in executing the warrant. (*Id.* ¶ 29.) Thereafter, South Hadley Police Officers Dominick and Camp, among others, were briefed on the search warrant. (Pl. SOF ¶ 10.)

At approximately 4:00 p.m. that day, South Hadley Police Officers Dominick, Camp and Mark Baran accompanied Hadley Police Officers Bertera, Bartlett and O'Connor to execute the search warrant. (So. Hadley SOF ¶ 31.) At the address listed on the search warrant, 5 Bach Lane, there were two structures—a family house and a shed just behind the house. (Hadley SOF ¶ 30.) Behind the shed were two additional structures—a garage and a recording studio—but these structures were actually located on 4 Bach Lane, which was also owned by Plaintiffs. (*Id.* ¶ 31.) Bartlett, O'Connor, Camp, and Baran be-

gan the search inside the house on 5 Bach Lane, while Bertera and Dominick stayed near Steven Opalenik. (So. Hadley SOF ¶ 32–33.) The officers did not find any of the items described in the search warrant inside Plaintiffs' home. (Hadley SOF 32.)[3]

Dominick and Bertera then searched the shed on 5 Bach Lane, where they discovered material indicative of an indoor marijuana growing operation. (Pl. SOF ¶ 11.)[4] Dominick then contacted Trooper John Cummings of the State Police Drug Unit and Lieutenant Sowa and, thereafter, informed Steven Opalenik that they were going to search the recording studio. (Pl. SOF ¶ 12, 37.) Despite Steven Opalenik's explanation at that time that both the garage and recording studio were actually located on 4 Bach Lane and that he was not consenting to the search, Cummings, Bertera and Dominick searched the recording studio and found the following: a 30–gallon bag filled with marijuana leaves and chaff, a large electrical scale, a plastic bag full of marijuana buds, a large hydro grow operation in the cellar with hundreds of marijuana plants, and marijuana drying in the attic. (Id.; So. Hadley SOF ¶ 38.) Dominick, Bertera and Cummings then obtained two additional warrants for both 4 and 5 Bach Lane to search for materials related to the use, production, or sale of marijuana and records pertaining thereto. (Pl. SOF ¶ 12.) Later that night, Steven Opalenik was arrested by Camp, at the direction of Sowa, for possession of a class D drug with intent to distribute and illegal

cultivation and manufacture of a class D drug. (So. Hadley SOF ¶ 41.) During the search pursuant to the two new search warrants, Dominick also found a 12–gauge shotgun in the recording studio. (Id. ¶ 43.) In addition to the drug charges, Steven Opalenik was later charged with various firearms violations. (Id.)

After being indicted and arraigned, Steven Opalenik filed a motion to suppress. (Id. ¶ 46.) Following a hearing, Judge Bertha Josephson of the Hampshire Superior Court denied the motion, finding that "the police did not exceed their authority granted under the [first] warrant" and that "the warrants for the properties search[ed] were properly issued as they were based on probable cause." (Exhibit 22 (Attached to So. Hadley SOF).) On January 6, 2009, following a jury-waived trial, Steven Opalenik was found guilty of possession of marijuana with intent to distribute in violation of MASS. GEN. LAWS ch. 94C, § 32C(a) and two counts of improper storage of a firearm in violation of MASS. GEN. LAWS ch. 140, § 131L(a) and (b). (So. Hadley SOF ¶ 47.)

Steven Opalenik appealed the denial of his motion to suppress and the subsequent findings of guilt. (Id. ¶ 48.) On appeal, the Commonwealth conceded that there was no probable cause to believe that the items described in Bartlett's affidavit were stolen by Steven Opalenik and that there was no timely nexus between the alleged theft and Steven Opalenik or his home. Opalenik, 2009 WL 4842245, at *1. After independently reviewing these issues, the

---

**3.** The following items, however, were found in the home: a revolver-stage gun, counterfeit bills, a digital flip scale, marijuana stems and chaff, a lever-action rifle, a glass pipe that appeared to contain burnt marijuana, a 20–gauge shotgun without a trigger lock, and three shotgun shells. (So. Hadley SOF ¶ 35.) In their Response to South Hadley's Statement of Undisputed Material Facts, Plaintiffs dispute that these items were found; they fail,

however, to point to any evidence supporting this assertion. See Fed.R.Civ.P. 56(e)

**4.** There is some dispute as to exactly what was found in the shed. The officers discovered, at the least, hydro pumps, PVC piping with plant cutouts, heaters, and fans. Defendants also assert that the officers discovered two marijuana plants as well, but Plaintiffs contest this assertion.

Massachusetts Appeals Court concluded that the Commonwealth's concessions were appropriate. *Id.* The court explained: "Not only is there no probable cause to believe [Steven Opalenik] had stolen any items from the house on March 10, 2008, there is no nexus between any alleged stolen items and the target property of the search warrant. In fact, it is not even clear from the affidavit that the items had been stolen or when they had last been seen." *Id.* The court also concluded that, because "the first warrant was invalid, the contraband obtained as a result of the second warrant must also be suppressed." *Id.* Accordingly, the court entered judgment for him. *Id.*

Further facts include the following. First, the Town of South Hadley's Selectboard, which is the policymaker on behalf of the town, has a policy to not conduct investigations of its Police Department involving issues pertaining to search warrants. (Pl. SOF ¶ 14.) Second, Hadley Police Chief Hukowicz conducted an investigation regarding Plaintiffs' allegations of police misconduct and found that all of his officers acted "per department policy and under the laws of the Commonwealth with [the] facts presented to them." (*Id.* ¶ 15; Exhibit 19 (Attached to Pl. SOF).) The Town of Hadley Selectboard unanimously agreed with Hukowicz. (Pl. SOF ¶ 15.) Third, in 2009, the Town of Hadley Selectboard hired the firm Badgequest to do an internal study of its Police Department; Badgequest found that the department was without sergeant supervision for approximately 450 shifts per years, that this practice could expose the town to liability for providing inadequate supervision, and that discipline was lacking in the department. (*Id.* ¶ 16.)

## III. DISCUSSION

### A. *Individual or Official Capacity*

There is some question as to whether Plaintiffs have asserted claims against the named Defendants in their individual capacities, their official capacities, or both. The Hadley Defendants argue that, because Plaintiffs failed to identify in what capacity the Hadley individuals were being sued and because only their official titles are listed in the complaint, Plaintiffs have only asserted official capacity claims against them. In support, the Hadley Defendants cite *Stratton v. City of Boston*, 731 F.Supp. 42, 45 (D.Mass.1989), for the proposition that, where a defendant is named by his title only, claims against him should be treated solely as official-capacity claims. In response, Plaintiffs maintain that they are asserting claims against the individual Defendants in both their official and individual capacities, relying on the sufficiency of their complaint in accord with *Biggs v. Meadows*, 66 F.3d 56, 59–60 (4th Cir.1995) (adopting majority approach that looks to "the substance of the plaintiff's claim, the relief sought, and the course of proceedings to determine the nature of a § 1983 suit when a plaintiff fails to allege capacity").

■ Plaintiffs have the better argument. First, the *Stratton* decision is inapposite insofar as it concerned a complaint that identified one of the defendants as "Francis Roache, Commissioner" in the *caption*. *Stratton*, 731 F.Supp. at 44. Here, Plaintiffs did not identify the official titles of the defendants in the caption of their complaint but within the complaint itself. Further, the court in *Stratton*, after explaining that the caption was ambiguous as to the plaintiffs' intentions, afforded them the opportunity to amend the complaint without subjecting it to dismissal. *Id.* at 45. The present case, of course, is at a different stage of the proceedings, and Plaintiffs' *pro se* status militates in favor of a more forgiving reading of their complaint. Although it does not appear

that the First Circuit itself has resolved the required specificity of the pleadings in this regard, this court, as was true in *Biggs*, 66 F.3d at 59, will look to "the substance of the plaintiff's claim, the relief sought, and the course of proceedings." Having done this, the court believes that an amendment to the pleadings is an unnecessary formality since Plaintiffs have now made clear their intent to sue the individual defendants in both capacities. Accordingly, the court treats Counts I, V, VI, VII and VIII as asserting both individual and official capacity claims.

■ As to Count II, however, which alleges illegal search and arrest pursuant to 42 U.S.C. § 1983 against Bertera, Bartlett, O'Connor, Hukowicz, Dominick, LaBrie and Camp, the court will treat the claims asserted therein as individual capacity claims only since Plaintiffs, in Counts III and IV, have also asserted section 1983 claims directly against the Towns of Hadley and South Hadley, thereby incorporating official-capacity claims against the individuals. Official capacity claims, of course, are actually claims against the entity itself, *see McMillian v. Monroe County*, 520 U.S. 781, 785 n. 2, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), and under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), municipalities are only liable for unconstitutional policies or practices. Thus, it would be redundant for Plaintiffs to assert official capacity claims in Count II only to assert essentially the same claims in Counts III and IV. *See, e.g., Machos v. City of Manchester*, 1995 WL 925010, at *5 (D.N.H. Sept. 20, 1995).

B. *Civil Conspiracy (Count I)*

In Count I, Plaintiffs allege that a mix of Hadley and South Hadley Defendants, namely, Bertera, Bartlett, O'Connor, Hukowicz, LaBrie, Dominick, Camp and Mail-

hott, "jointly and severally, conspired to deprive [them] of their constitutional protections and rights guaranteed under the Fourth and Fourteenth Amendments of the United States Constitution and Articles 1 and 14 of the Massachusetts Declaration of Rights." Specifically, Plaintiffs claim that these Defendants, along with non-defendant Thomas Tudryn, conspired to fabricate the charge of stolen property so that they could gain access to Plaintiffs' house "for ulterior motives," presumably, to discover the marijuana growing operation. All of the parties have treated Count I as asserting Massachusetts common law conspiracy claims. That treatment is appropriate since Count I, as distinct from Counts II, III and IV, does not invoke section 1983 or any other statute.

With that in mind, the Hadley and South Hadley Defendants argue in their motions for summary judgment that Plaintiffs have not brought forward sufficient evidence in support of their claim of common law conspiracy. Plaintiffs, in response, contend that they have presented adequate circumstantial evidence for a jury to infer such a conspiracy. Defendants, in the court's view, have the far better argument

■ "Massachusetts recognizes two types of civil conspiracy: true conspiracy and conspiracy based on vicarious liability. *See Taylor* [*v. American Chemistry Council*, 576 F.3d 16, 34–35 (1st Cir.2009)]. To establish true conspiracy, plaintiffs must show that 'defendants, acting in unison, had some power of coercion over [plaintiffs] that they would not have had if acting independently.' *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir.1994)." *Inman v. Siciliano*, 2012 WL 1980408, at *16 (D.Mass. May 31, 2012). Conspiracy based on vicarious liability, on the other hand, "requires 'first, a common design or agreement, although not necessarily express, between two or more per-

sons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement.'" *Id.* (quoting *Aetna Cas. Sur. Co.*, 43 F.3d at 1564). Here, it is clear that Plaintiffs, based on their opposition, are pursuing a claim of conspiracy based on vicarious liability only.

Defendants first argue that Plaintiffs cannot show any underlying tort or civil rights violation. Second, they argue that Plaintiffs cannot show that the named Defendants had a common design or agreement. As to the first argument, the court will assume that the searches and seizures—which the Massachusetts Appeals Court concluded were not supported by probable cause—satisfy the requirement for an underlying civil rights violation or tort. As to the second argument, however, the court agrees with Defendants that Plaintiffs have not presented sufficient evidence, whether direct or circumstantial, which supports their assertion that there was an agreement among the identified Defendants to do a wrongful act.

█ To be sure, there is some evidence of communication between the Hadley and South Hadley Police Departments on March 10, 2008, and some evidence that Steven Opalenik's vehicle was followed by the Hadley police on two different occasions prior to Thomas Tudryn's incident report. But even considering those events, the court concludes that a reasonable jury could not find or infer an agreement between the two police departments or members thereof to deprive Plaintiffs of their civil rights or to commit a tort. The evidence shows, at most, an attempt by the Hadley Police Department to share information with the South Hadley Police Department in connection with a suspicious encounter with Plaintiffs. And while the evidence may also show that the Hadley Police Department initiated an investigation by tracking Plaintiffs' vehicle prior to receiving the Tudryns' incident report, it fails to support Plaintiffs' theory, let alone a fair inference, that the various Defendants fabricated the stolen property allegation. If anything, the evidence indicates that the Hadley Police Department was legitimately concerned about Plaintiffs' presence at 425 River Drive. Granted, as far as the Massachusetts Appeals Court was concerned, the Hadley Police Department had *in* sufficient justification to believe that Plaintiffs had stolen the property; but, the evidence certainly does not demonstrate a conspiracy among the Hadley and South Hadley police officers or a fair inference thereof that could support a jury verdict in Plaintiffs' favor.

Neither does the fact that the Hadley Police Department had possibly linked Plaintiffs to the Lee incident aid their conspiracy theory. "[W]hat is lacking is the showing ... of an anticipatory agreement, an essential element of common-law conspiracy." *Farrah ex rel. Estate of Santana v. Gondella,* 725 F.Supp.2d 238, 249 (D.Mass.2010). Nor have Plaintiffs presented any evidence suggesting that the various Defendants had prior knowledge of Plaintiffs' marijuana operation or that they had any ulterior motive for searching their property. Accordingly, the court will enter summary judgment in Defendants' favor on Count I.

### C. *Illegal Search and Arrest pursuant to Section 1983 (Count II)*

Plaintiffs allege in Count II that the initial search warrant was not supported by probable cause, that certain individuals comprised of both the Hadley and South Hadley Defendants searched beyond the scope of that search warrant, and that they lacked probable cause to arrest Steven Opalenik. In seeking summary judgment on this count, the South Hadley Defendants argue that they were not involved in

obtaining the initial search warrant, that they did not search beyond the scope of that warrant (because the other structures on 5 Bach Lane and 4 Bach Lane were within the curtilage of the house), and that probable cause existed to arrest Steven Opalenik because the marijuana operation was discovered in plain view. They also argue that they are protected by qualified immunity. The Hadley Defendants, in some contrast, do not address the possible constitutional violations but echo the South Hadley Defendants' argument regarding qualified immunity.

■■ "[T]he qualified immunity inquiry is a two-part test. A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 268–69 (1st Cir.2009). Although the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), held that courts must conduct the qualified immunity analysis in sequence—that is, decide whether a plaintiff's constitutional right has been violated before determining whether the right was "clearly established"—it has since abandoned that requirement, *see Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Now, "[i]f 'it is plain that a constitutional right is not clearly established,' a court may grant the requested immunity without undertaking the 'essentially academic exercise' of ascertaining whether the specific facts depict a constitutional violation." *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir.2011) (quoting *Pearson*, 555 U.S. at 237, 129 S.Ct. 808).

1. *Underlying Constitutional Violations*

Regarding the initial search warrant, the court will assume, without deciding, that the warrant lacked probable cause in light of the Massachusetts Appeals Court decision and, thus, that the search violated Plaintiffs' constitutional rights under the Fourth Amendment. The search warrant, however, only described the house at 5 Bach Lane; the Massachusetts Appeals Court did not discuss whether the officers searched beyond the scope of the warrant by entering the shed at 5 Bach Lane and/or the recording studio at 4 Bach Lane. Therefore, this court is faced with the additional question of whether the officers may have also violated Plaintiffs' constitutional rights by searching beyond the face of the warrant. This question must be answered as part of the qualified immunity analysis which, in turn, has required the court to dig deeply into the facts.

The South Hadley Defendants argue that the shed "clearly was located on 5 Bach Lane. Thus, there can be no question that it would meet the definition of a structure appurtenant to the curtilage of the main building." They argue as well that the garage and recording studio on 4 Bach Lane "also were appurtenant to the main building and, thus, were within the curtilage of the house." More specifically, they argue that the garage and house were connected by a fence, the garage was the same color as the house and shed, and the photograph attached to Bartlett's search warrant affidavit "showed the fence connected to a portion of the garage and it showed the recording studio." The photograph, in the court's opinion, is not so clear.

In any event, Plaintiffs respond that the search warrant only listed "5 Bach Lane" and only described the house, not the shed, garage or recording studio. They also contest the assertion that the photograph shows the garage and recording studio; rather, they claim, the "[p]hotograph

shows a building unknown to the officers of an occupied residential building." In addition, according to Plaintiffs, Steven Opalenik informed the officers that the garage and recording studio were located on 4, not 5, Bach Lane. Since all these structures were not within the curtilage of the house, Plaintiffs argue, Defendants searched beyond the warrant's scope.

▇ The scope of a warrant has often been addressed by both federal and state courts. As the First Circuit has explained, "[t]he authority to search granted by any warrant is limited to the specific places described in it, and does not extend to additional or different places.... For example, warrants authorizing a search of 'premises' at a certain address authorize a search of the buildings standing on that land." *United States v. Bonner*, 808 F.2d 864, 868 (1st Cir.1986) (citations omitted). A warrant authorizing a search of a specific dwelling, the Massachusetts Supreme Judicial Court ("SJC") has held, also may permit the search of areas within the curtilage of that dwelling, even though the warrant does not mention "curtilage." *See Commonwealth v. Escalera*, 462 Mass. 636, 970 N.E.2d 319, 329 (2012); *see also Sowers v. State*, 724 N.E.2d 588, 590 (Ind. 2000); *United States v. Gorman*, 104 F.3d 272, 275 (9th Cir.1996). As the SJC explained, "[c]urtilage is treated as an extension of the home, both for extending Fourth Amendment protections and for defining the scope of search warrants." *Commonwealth v. McCarthy*, 428 Mass. 871, 705 N.E.2d 1110, 1112 (1999). Generally speaking, therefore, the scope of a search pursuant to a warrant extends only to the areas explicitly described in the warrant and, under certain circumstances, to the curtilage of a dwelling if the warrant authorizes a search of the dwelling in its entirety.

▇ Here, the initial search warrant described the location of the search as 5 Bach Lane, South Hadley, Massachusetts. It is a brown colored single family house with a black roof with one skylight located in the front of the roof. There is a light colored wood front door with a pineapple display hanging just to the left of it, along with the number 5 clearly displayed, two cement stairs lead to this front door, and a driveway just to the left of the house.

(Exhibit 4 (Attached to Pl. SOF).) In light of the principles discussed above, the court concludes that, while the shed on 5 Bach Lane likely was within the proper scope of the search warrant, as part of the curtilage to the main house, the garage and recording studio on 4 Bach Lane clearly were not. The South Hadley Defendants fail to cite any authority for the proposition that the curtilage of a dwelling located on one piece of property may extend onto a separate but adjoining piece of property. Accordingly, the court finds, the Defendant officers exceeded the authorized scope of the warrant when they searched the recording studio. *See Bonner*, 808 F.2d at 868.

This finding is supported by the Supreme Court's analysis in *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). Although upholding the validity of the search at issue, the Court indicated that officers are obligated to limit their search to the address listed in the warrant, there "the premises known as 2036 Park Avenue third floor apartment" and the person of Lawrence McWebb. *Id.* at 80, 107 S.Ct. 1013. Unknown to the officers, however, there were actually two apartments on the third floor occupied by two individuals, McWebb in one and Harold Garrison in the other. The officers executed the warrant and searched Garrison's apartment before real-

izing that the third floor contained two apartments. The Supreme Court concluded that the terms of the warrant authorized the search of the entire third floor but explained that, "[i]f the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to McWebb's apartment." *Id.* at 82, 86–87, 107 S.Ct. 1013. Nevertheless, the Court held that the search of Garrison's apartment would not have been invalid "even if the warrant is interpreted as authorizing a search limited to McWebb's apartment rather than the entire third floor" because "[t]he objective facts available to the officers at the time suggested no distinction between McWebb's apartment and the third-floor premises." *Id.* at 88, 107 S.Ct. 1013. Moreover, the Court noted, "neither McWebb nor Garrison informed [the officers] that they lived in separate apartments." *Id.* at 88 n. 12, 107 S.Ct. 1013.

Here, in sharp contrast, the warrant only authorized a search of the "family house" on 5 Bach lane and, before the officers searched the recording studio, Steven Opalenik expressly told them that it, as well as the garage, were located on 4 Bach Lane. At that moment, therefore, the officers, pursuant to *Garrison*, were obligated to limit their search to 5 Bach Lane. *See also People v. Perez*, 266 A.D.2d 242, 697 N.Y.S.2d 672, 673 (N.Y.App.Div.1999) ("[T]he police simply searched a building which they knew was not the one targeted in the warrant."); *People v. Sanchez*, 191 Ill.App.3d 1099, 139 Ill.Dec. 128, 548 N.E.2d 513, 516–17 (1989) ("[T]he police officers knew or should have known that 4840 West North Avenue was a separate building and should have limited their search to the 4844 building for which they had a warrant.").

Other cases are similarly on point. In *Keiningham v. United States*, 287 F.2d 126 (D.C.Cir.1960)—on which the SJC relied in *Commonwealth v. Hall*, 366 Mass. 790, 323 N.E.2d 319, 325–26 (1976)—officers obtained a search warrant for "1106 Eighteenth Street, N.W.," which was directly next to "1108 Eighteenth Street, N.W." "in a series of row houses each of which [was] connected by party walls to the house on either side." *Keiningham*, 287 F.2d at 128. When the officers searched 1106 Eighteenth Street, they "observed, on one side of the porch, a partition between 1106 and 1108 Eighteenth, Street, N.W., in which there was a freshly cut door, and 'tools lying all around.'" *Id.* They then proceeded through the door and searched 1108 Eighteenth Street, where they found the subjects of the warrant and evidence of gambling. *Id.* at 128–29. Despite the government's argument that "appellants were using the two houses as a single unit [and, therefore,] the search warrant for 1106 should ... be construed to embrace 1108 as well," the court held that the search of 1108 Eighteenth Street was beyond the scope of the warrant, explaining that "[t]he authority to search is limited to the place described in the warrant and does not include additional or different places." *Id.* at 129; *see also United States v. Schroeder*, 129 F.3d 439, 442, 443 (8th Cir.1997) (officers searched beyond the scope of the warrant because the defendant's "camper trailer was distinctly separated from the property described in the warrant" and "[t]he relevant cases do not support an interpretation of this warrant that would authorize the officers to extend their search into the well-demarcated bounds of a neighboring curtilage"; furthermore, *Garrison*'s good-faith exception did not apply because " 'the of-

ficers undertook a search that caused them to invade what they could not fail to have known was potentially [another's] curtilage'") (quoting *United States v. Reilly,* 76 F.3d 1271, 1281 (2nd Cir. 1996)); *Landers v. State,* 250 Ga. 808, 301 S.E.2d 633, 634 (1983) ("But 'curtilage' does not include neighboring or nearby property which is beyond the property lines of the dwelling specified in the warrant.").

■ To be sure, there is at least one case which goes in the opposite direction. In *United States v. Villanueva Magallon,* 43 Fed.Appx. 16, 17 (9th Cir.2002) (unpublished), the government obtained a warrant to search "792 Ada Street"; a garage and house also were located on "784 Ada Street." Officers searched both properties and found drugs on 784 Ada Street. *Id.* The Ninth Circuit held that "it was proper to search [784] on the strength of the 792 warrant," noting that the defendant "possessed and controlled both 792 and 784 and, in fact, 784 was not being used as a separate residence by some third, innocent party." *Id.* at 17–18. The Ninth Circuit also noted that, "[f]rom the record, it is clear that 784 was within the curtilage of 792." *Id.* at 18. This court, however, is not persuaded that *Villanueva Magallon* provides much guidance here. None of

the cases cited therein in support of the conclusion that 784 Ada Street "was within the curtilage" of 792 Ada Street involved separate properties or addresses. *See id.* (citing *United States v. Cannon,* 264 F.3d 875, 881 (9th Cir.2001); *United States v. Johnson,* 256 F.3d 895, 901–04 (9th Cir. 2001); *Gorman,* 104 F.3d at 273, *Mena v. City of Simi Valley,* 226 F.3d 1031, 1038 (9th Cir.2000); *United States v. Alexander,* 761 F.2d 1294, 1300–01 (9th Cir.1985); *United States v. Whitten,* 706 F.2d 1000, 1008 (9th Cir.1983); *United States v. Whitney,* 633 F.2d 902, 907–08 (9th Cir.1980)). Moreover, as the cases discussed above demonstrate, once officers are put on notice that an area is outside the address listed in the warrant, they may not search that area under its auspices.[5]

■ Accordingly, the court concludes, for present purposes, that Defendants violated Plaintiffs' constitutional rights under the Fourth Amendment by searching the recording studio beyond the scope of the warrant. As to Plaintiffs' argument that Defendants lacked probable cause to arrest Steven Opalenik, the court agrees with Defendants that probable cause for his arrest existed in light of the discovery of the marijuana operation. Despite the fact that his conviction was thereafter

---

**5.** There is, of course, a line of cases in the First Circuit permitting searches of structures "appurtenant" to areas described in the warrant but technically outside of the property. These cases, however, have been limited to relatively small structures in close proximity to the described area, more like the shed in the instant case. *See United States v. Fagan,* 577 F.3d 10, 12, 14 (1st Cir.2009) (warrant authorizing search of "third-floor apartment and cellar" permitted search of closet eight feet from apartment's front door in area where no other apartments were located); *United States v. Principe,* 499 F.2d 1135, 1137 (1st Cir.1974) (cabinet "three to six feet away from the entrance to the apartment, in a small hallway directly opposite the door that led

into the apartment" properly searched). Moreover, in both cases, the First Circuit relied, at least in part, on a good-faith exception similar to that established in *Garrison,* 480 U.S. at 88, 107 S.Ct. 1013. For example, in *Fagan,* the First Circuit made sure to cite "the utter absence of countervailing information" that would have indicated to the officers that the closet just outside of the door to the apartment was outside the scope of the warrant. *Fagan,* 577 F.3d at 15; *see also Principe,* 499 F.2d at 1137 ("[T]he officers could reasonably suppose, given the second floor layout and its close proximity to the apartment, that the cabinet was appurtenant to the apartment, as in fact it was.").

overturned by the Massachusetts Appeals Court, the arrest itself does not represent an independent constitutional violation.

### 2. Qualified Immunity

 As mentioned, both the South Hadley Defendants and Hadley Defendants contend that, even if the officers violated Plaintiffs' constitutional rights, they are nonetheless protected by qualified immunity because their actions were objectively reasonable. As Magistrate Judge Judith Dein explained:

> Qualified immunity shields government officials performing discretionary functions from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the objective legal reasonableness of the action ... assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (quoting *Harlow*, 457 U.S. at 818–19, 102 S.Ct. at 2738–39). While qualified immunity cannot protect the defendants from liability if, on an objective basis, no reasonably competent officer would have acted as [he or she] did, "if officers of reasonable competence could disagree on [the lawfulness of the alleged conduct], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Thus, the defense of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.*

*Nolan v. Krajcik*, 384 F.Supp.2d 447, 465 (D.Mass.2005). Here, the court will conclude, the officers are indeed protected by qualified immunity in relation to the application for the first search warrant and the search of house and the shed. However, because an objectively reasonable officer should have known that the recording studio was beyond the scope of the warrant, the court will conclude that the officers are not protected by qualified immunity with regard to the search of that structure.

As to the application for the initial warrant, Defendants cite *Messerschmidt v. Millender*, —— U.S. ——, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012), for the proposition that when a search warrant has been issued by a neutral magistrate, the officers who executed the warrant are presumptively entitled to qualified immunity. Plaintiffs do not address *Messerschmidt*, citing instead both *Williams v. County of Santa Barbara*, 272 F.Supp.2d 995 (C.D.Cal.2003), and *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), in support of their contention that the application for the search warrant, although ultimately approved, was not objectively reasonable and, thus, that the officers are not entitled to qualified immunity.

The Supreme Court explained in *Messerschmidt* that "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or, as we have sometimes put it, in 'objective good faith.'" *Messerschmidt*, 132 S.Ct. at 1245 (quoting *United States v. Leon*, 468 U.S. 897, 922–923, 104 S.Ct. 3430, 82 L.Ed.2d 677 (1984)). The Supreme Court cited *Leon*, which established a good-faith exception to the exclusionary rule in criminal cases, because " 'the same standard of objective reasonableness that we applied in

the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer' who obtained or relied on an allegedly invalid warrant." *Id.* at 1245 n. 1 (quoting *Malley,* 475 U.S. at 344, 106 S.Ct. 1092).[6] The Court continued: " '[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination' because '[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause, and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.' " *Id.* (again quoting *Leon,* 468 U.S. at 921, 104 S.Ct. 3430).

 There is an exception to this general rule, however, "when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.' " *Id.* (quoting *Malley,* 475 U.S. at 341, 106 S.Ct. 1092). In analyzing whether this exception applied in *Messerschmidt,* the Supreme Court compared that warrant to one in a prior case, *Groh v. Ramirez,* 540 U.S. 551, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004), in which it found the exception applicable. In *Groh,* the Court "held that officers who carried out a warrant-approved search were not entitled to qualified immunity because the warrant in question failed to describe the items to be seized *at all.*" *Messerschmidt,* 132 S.Ct. at 1250. "Because 'even a cursory reading of the warrant in [that] case—perhaps just a simple glance—would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal' ... we held that the officer was not entitled to qualified immunity." *Id.* (quoting *Groh,* 540 U.S. at 564, 124 S.Ct. 1284). However, since any defect

regarding the warrant in *Messerschmidt* "would not have been obvious from the face of the warrant" or from "just a simple glance," and in light of "[t]he fact that none of the officials who reviewed the application expressed concern about its validity," the Court held that *Groh* did not control and the exception did not apply. *Id.*

The Supreme Court in *Messerschmidt* also examined the officers' conduct in preparing the search warrant application, explaining that

> the fact that the officers sought and obtained approval of the warrant application from a superior and a deputy district attorney before submitting it to the magistrate provides further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause.

*Id.* at 1249. The Court also noted that, "[b]efore seeking to have the warrant issued to a magistrate, Messerschmidt conducted an extensive investigation into [the defendant's] background and the facts of the crime" and then "prepared a detailed warrant application that truthfully laid out the pertinent facts." *Id.* Accordingly, the Court explained, "it cannot be said that 'no reasonable officer of reasonable competence would have requested the warrant.... Indeed, a contrary conclusion would mean not only that Messerschmidt and [another superior officer] were 'plainly incompetent' ... but that their supervisor, the deputy district attorney, and the magistrate were as well." *Id.* (quoting *Malley,* 475 U.S. at 341, 346 n. 9, 106 S.Ct. 1092).

In this case, in addition to the clerk's issuance of the warrant—which, as men-

---

**6.** It is important to note that Massachusetts state courts do not recognize *Leon's* good-faith exception, *see, e.g., Commonwealth v. Lobo,* 82 Mass.App.Ct. 803, 978 N.E.2d 807, 807–808 (2012), and, therefore, had no reason to apply it in the underlying criminal trial or appeal.

tioned, "is the clearest indication that the officers acted in an objectively reasonable manner," *id.* at 1245—Bartlett, who prepared the application, spoke with the officers who responded to the incident at 425 River Drive, read the incident reports, met with Thomas and William Tudryn, and toured and took photographs of their property. He then drafted an affidavit setting forth the facts with the assistance of Bertera, a more senior officer. In relevant part, the affidavit described the "fresh footprints from the garage up the stairs into the door," the fact that the upstairs door "had been forced open" leaving "wood splinters on the floor" and the "piece of wood which covered the door [and had been] nailed shut" "broken off the door frame and lying on the ground," and the "sledgehammer along with other various tools that are known to us as burglarious tools" in the trunk of Plaintiffs' vehicle. (Exhibit 7 (Attached to So. Hadley SOF).) The affidavit also described the "pile of various antiques that were located next to an open door that had also been locked previously by the owners." (*Id.*) In addition, it described some of the property reported missing by Thomas Tudryn on March 11, 2008: "a set of Antique dishes, which had birds & floral rim and center, gold, trim"; "a Beetles (sic) figurine with initials of 'kt' or 'ket' ... located on the bottom, which is a one of a kind item"; and "various records with some of them having initials indicating the owners (sic) name on them." (*Id.*) Finally, the affidavit explained why Bartlett thought Plaintiffs would store the items in their home, noting that "the stolen items are so distinctive that there is not an open market for these items to be easily traded or sold" and that, in light of his "training and experience," he believed that the items "may be retained for days or weeks after its theft." (*Id.*)

Although the Massachusetts Appeals Court thereafter stated that "it is not even clear from the affidavit that the items had been stolen," this court believes, for purposes of its qualified immunity analysis, that the affidavit at least implied that the items had been stolen; Bartlett expressed his belief "that the crime of Breaking and Entering as well as Larceny from a Building ... have been committed" at the residence. (*Id.*) The affidavit also describes, in three different places, the missing property, including in an addendum that states "I am seeking the issuance of a warrant to search for the following property." (*Id.*) It is true that the affidavit fails to expressly state that the items are missing or had been stolen, "[b]ut search warrants are not always self-elucidating and, in all events, search warrants must be read in a practical, common-sense manner." *United States v. Fagan*, 577 F.3d 10, 13 (1st Cir. 2009). Reading the warrant as a whole, this court finds, a reasonable officer could have believed that the warrant was sufficiently clear in stating that the described property was missing from 425 River Drive and was believed to have been stolen by Plaintiffs. This is not a warrant like the one in *Groh*, 540 U.S. at 564, 124 S.Ct. 1284, in which "just a simple glance" reveals "a glaring deficiency."

Still, the Massachusetts Appeals Court held, after the Commonwealth conceded as much, that the warrant was not supported by probable cause that Steven Opalenik stole the items and, as well, that there was an insufficient nexus between the items and Plaintiffs' house. In terms of a qualified immunity analysis, however, this court cannot say that the warrant and affidavit were "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Messerschmidt*, 132 S.Ct. at 1245 (quoting *Leon*, 468 U.S. at 923, 104 S.Ct. 3430).

Again, a neutral magistrate approved the warrant, which creates a "shield of immunity" for the officers who applied · for it that "rare[ly]" will be lost. *Id.* at 1245, 1250. In addition, the fact that multiple police officers, both from the Hadley and South Hadley Police Departments, implicitly approved of the application for and the execution of the warrant—rather than demonstrating some vast conspiracy, as Plaintiffs claim—supports Defendants' contention that the officers acted under a reasonable belief that they were not violating the Constitution. *See Messerschmidt*, 132 S.Ct. at 1249.

 Moreover, Plaintiffs did not have a "clearly established" right to be free from the search of their home under these circumstances. *See Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) ("[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."). In short, Plaintiffs have not presented, and the court had not found, any case with comparable facts that could have served as guidance to the officers. *See Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 23 (1st Cir.2001) ("To determine the contours of a particular right at a given point in time, an inquiring court must look not only to Supreme Court precedent but to all available case law."). As the First Circuit explained in *Brady v. Dill*, 187 F.3d 104, 116 (1st Cir.1999), "the law," to be clearly established, "must have defined the right in a quite specific man-

ner, and that announcement of the rule establishing the right must have been unambiguous and widespread, such that the unlawfulness of particular conduct will be apparent *ex ante* to reasonable public officials." That is simply not the situation here with regard to the application for the initial search warrant and the ensuing search of the house and shed.[7]

 The statement by the Massachusetts Appeals Court that there was an insufficient nexus between the items and Plaintiffs' house does not alter this court's qualified immunity analysis. The court is persuaded here that "the nexus between the items to be seized and the place to be searched need not be based on direct observation.... The nexus may be found in the type of crime, the nature of the missing items, the extent of the suspects' opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property." *Commonwealth v. Cinelli*, 389 Mass. 197, 449 N.E.2d 1207, 1216 (1983) (citation and internal quotation marks omitted); *see also Commonwealth v. Wilson*, 427 Mass. 336, 693 N.E.2d 158, 167 (1998) (items that are "durable [and] of continuing utility to the defendant" and that "are not inherently incriminating" are "reasonably likely to be found in a defendant's home after a crime" (internal quotation marks omitted). Moreover, the fact that other Tudryn family members also had access to the house and, thus, may have themselves taken the items does not, in the court's view, significantly

---

7. Even if the court were to determine that the shed on 5 Bach Lane was not within the curtilage of the main house, it nevertheless would conclude that the officers are similarly protected by qualified immunity for their decision to search that structure. As discussed, there is authority for the proposition that a warrant authorizing the search of a dwelling on a particular piece of property also permits a search of additional structures on the prop-

erty if the other structure is located within the curtilage of the dwelling described in the warrant. *See, e.g., Escalera*, 970 N.E.2d at 329; *Sowers*, 724 N.E.2d at 590; *Gorman*, 104 F.3d at 275. This is true even if the warrant does not explicitly authorize the search of "curtilage." *See id.* Simply put, it was not unreasonable for the officers here to believe that the shed was within the curtilage of the main house.

change the analysis. *See Robinson v. Gerritson,* 210 F.Supp.2d 1004, 1011 (N.D.Ill. 2002) ("Robinson points to no authority indicating that for probable cause to exist the theft suspect must have been the only individual with access to the missing property."). Based on the totality of the circumstances, "officers of reasonable competence could disagree" on the lawfulness of obtaining a warrant to search Plaintiffs' home for the missing items, and, therefore, qualified immunity applies. *See Malley,* 475 U.S. at 341, 106 S.Ct. 1092.

■ The court concludes, however, that the officers are not entitled to qualified immunity for searching the recording studio on 4 Bach Lane, it being beyond the scope of the warrant. As described, the initial warrant was explicitly limited to the "family house" on 5 Bach Lane. Implicitly, at best, it was limited to that structure's curtilage, which could not extend beyond 5 Bach Lane. While Defendants assert that the officers held a reasonable belief that the garage and recording studio were also located on 5 Bach Lane and, thus, were within the curtilage of the main house, they were expressly told by Steven Opalenik that those structures were in fact located on 4 Bach Lane.

As discussed, given the configuration of the properties, the fact that the officers were put on notice that they risked searching areas beyond the address listed in the warrant, and the further fact that Steven Opalenik had refused to consent to the further search, the Defendant officers had an obligation to conduct some further investigation into whether those structures were outside the scope of the warrant, including, if necessary, determining the applicable property boundaries. There is abundant persuasive case law in this regard. *See United States v. Reilly,* 76 F.3d 1271, 1281–82 (2d Cir.1996) (good-faith exception to exclusionary rule did not apply

because "there was a lot 'more the officer[s] could have or should have done under these circumstances to be sure [their] search would be legal.... Indeed, they knew very well that large parts of their search were potentially illegal.'" (quoting *United States v. Thomas,* 757 F.2d 1359, 1368 (2d Cir.1985)); *United States v. Cato,* 1996 WL 742309, at *6 (6th Cir. Dec. 23, 1996) (unpublished) ("Under *Garrison,* therefore, the officers should have discontinued the search as soon as they discovered that two separate units were identified on the warrant and were therefore put on notice of the risk that they might erroneously search a unit."); *compare Bonner,* 808 F.2d at 867 ("Even assuming that the search warrant was invalid due to the omission of the address, the evidence was properly admitted under the good-faith exception to the warrant requirement" because "the agents ... took every step that could reasonably be expected of them."); *United States v. Stewart,* 129 Fed.Appx. 758, 768 n. 10 (4th Cir.2005) (unpublished) ("[E]ven if the shed was on another parcel, any error would not implicate the exclusionary rule because suppression is not required when agents executing a search warrant make an objectively reasonable mistake as to the boundaries of the property that they are authorized to search."); *United States v. Patterson,* 278 F.3d 315, 318 (4th Cir.2002) ("[W]e have little trouble concluding that the DEA agents investigating the ... property held an objectively reasonable belief that the gravel area in front of the property was part of the *premises encompassed within their* warrant," "[g]iven the agents' observations during surveillance, and the absence of any indication to the contrary"); *United States v. Jefferson,* 2010 WL 1186279, at *6 (E.D.Wisc. March 22, 2010) ("This was not a situation where the officers searched an area they plainly should have known was

unconnected to the premises identified in the warrant.").

Instead, the officers chose to ignore Steven Opalenik's statement regarding the property boundaries and to search a structure on 4 Bach Lane without conducting a sufficient investigation. Granted, as Defendants point out, the officers did ask Plaintiff to produce documents "such as electric bills" showing that those structures were located on 4 Bach Lane. (So. Hadley SOF ¶ 45.) In the court's view, however, this one request was not sufficient under the circumstances when it was clear that the warrant's scope was limited to 5 Bach Lane. *Compare Garrison,* 480 U.S. at 88 & n. 12, 107 S.Ct. 1013 ("the objective facts available to the officers at the time suggested no distinction between" the third floor apartments and neither resident "informed them that they lived in separate apartments"). Accordingly, the Defendant officers did not have an objectively reasonable belief that the garage and recording studio were located on 5 Bach Lane and, therefore, qualified immunity does not apply. *Cf. Messerschmidt,* 132 S.Ct. at 1245 n. 1 (" 'the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer' who obtained or relied on an allegedly invalid warrant." (quoting *Malley,* 475 U.S. at 344, 106 S.Ct. 1092)).

Parallel events confirm this conclusion, most notably Defendants' assertion that the officers found two marijuana plants in the shed on 5 Bach Lane. Even assuming that is true, the officers could have sought additional search warrants at that point explicitly authorizing searches of the garage and recording studio in relation to the drugs. Instead, after being informed by Steven Opalenik that the two properties were separate, the officers simply called the State Police Drug Unit and proceeded to search the recording studio. At that point, therefore, the officers converted their narrow search of 5 Bach Lane for allegedly stolen items into a "general search" of the entire area for drugs. *See Garrison,* 480 U.S. at 84, 107 S.Ct. 1013 ("The manifest purpose of [the particularity requirement in the Warrant Clause of the Fourth Amendment] was to prevent general searches."). Thus, not only did the officers fail to conduct some minimal investigation into the boundaries of the subject property, they appear to have used the first search warrant as an excuse for conducting the type of "wide-ranging exploratory searches the Framers intended to prohibit."[8] *Id.* As it turns out, the officers did not seek or obtain additional warrants for drugs until *after* searching the recording studio and finding the marijuana growing operation. Given these facts as presently before the court, a reasonable officer would have understood this conduct to be unconstitutional.

For these reasons, the court will enter summary judgment for Defendants on that portion of Count II which asserts claims for lack of probable cause in support of the initial search warrant and the arrest of Steven Opalenik. The court, however, will deny Defendants's motion for summary judgment on that portion of Count II which asserts a claim against Bertera and Dominick for searching beyond the scope of the initial warrant.[9]

---

8. Defendants have not argued exigency or any other exception which might have justified a warrantless search of the recording studio.

9. The court notes that Plaintiffs also appear to assert a supervisory liability claim against Hukowicz in his individual capacity. Plaintiffs, however, have not presented any evidence establishing an "affirmative link" between the unconstitutional behavior of the officers and Hukowicz. *See Pineda v. Toomey,* 533 F.3d 50, 54 (1st Cir.2008). There-

D. *Failure to Properly Train and Supervise pursuant to Section 1983 (Counts III and IV)*

In their summary judgment motions, Defendants argue that Plaintiffs have not set forth evidence to support their claims in Counts III and IV that both the Towns of Hadley and South Hadley failed to "properly select, train, supervise, and discipline" their officers pursuant to "official practices, customs, and policies," which caused them to violate Plaintiffs' constitutional rights. In response, Plaintiffs argue broadly that the select boards for both towns are "the policy makers on behalf of the [municipalities] and [have policies] that [they] do not conduct investigations of [their] Police Department[s] involving issues of misconduct of [their] officers concerning search warrants and searches and seizures."

■■■■ "Under Section 1983, it is well established that a municipality is not liable for the actions of its employees simply by virtue of the employment relationship." *Freeman v. Town of Hudson*, 849 F.Supp.2d 138, 149 (D.Mass.2012) (citing *Monell*, 436 U.S. at 691, 98 S.Ct. 2018). "Instead, under *Monell* and subsequent cases, a plaintiff seeking to prove municipal liability under Section 1983 must identify a municipal policy or custom that caused plaintiff's injury." *Id.* "A Section 1983 claim based on a theory of municipal policy is only viable where 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers.'" *Id.* (quoting *Monell*, 436 U.S. at 690, 98 S.Ct. 2018). In addition to "official" policies, a plaintiff may also point to a municipality's custom or practice that is "so permanent and well settled as to

constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691, 98 S.Ct. 2018. Moreover, "[t]he governmental policy must be so tied to the challenged acts that it can be said to be the moving force of the constitutional violation." *Freeman*, 849 F.Supp.2d at 149; *see also City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."). And to succeed on a claim of failure to train—which is usually the "most tenuous" claim of municipal liability—a plaintiff must demonstrate that the "municipality's failure to train its employees in a relevant respect ... amount[ed] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick v. Thompson*, —— U.S. ——, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (quoting *City of Canton*, 489 U.S. at 388, 109 S.Ct. 1197).

■■ Although Plaintiffs proffer some evidence in support of their claims—namely, a letter from the Town of South Hadley Selectboard, stating that it "does not conduct investigations of its Police Department involving issues of search and seizures," and the Badgequest internal study with regard to the Town of Hadley—the court concludes that they have not sufficiently shown customs, policies, or practices that caused them any constitutional deprivation. The letter from the South Hadley Selectboard merely shows that that body does not investigate its Police Department regarding searches and seizures; it does not show that the Police Department itself has a policy of not investigating allegations of police officer misconduct or fails to properly select, train,

fore, any supervisory liability claim against Hukowicz must fail as a matter of law.

supervise, or discipline its officers. As for the Town of Hadley, the Badgequest study goes somewhat further, but Plaintiffs have not demonstrated any link between the inadequacies identified in the study and the events of this case. *See City of Canton,* 489 U.S. at 385, 109 S.Ct. 1197. Accordingly, the court will enter summary judgment in favor of Defendants on Counts III and IV.

### E. *Massachusetts Civil Rights Act ("MCRA") Violations (Count V)*

In Count V, Plaintiffs allege pursuant to the MCRA that Defendants "in concert with one another and with others who were present at the scene, interfered with and/or attempted to interfere with the Plaintiffs' rights secured by the constitution and laws of the United States, and rights secured by the constitution and laws of the commonwealth, by threats, intimidation and/or coercion." The Hadley and South Hadley Defendants argue that Plaintiffs have not provided any evidence of threats, intimidation, or coercion.

For their part, the South Hadley Defendants also argue that, to the extent they are being sued in their official capacities, they are not liable under the MCRA; Plaintiffs correctly conceded the point at oral argument. *See Kelley v. LaForce,* 288 F.3d 1, 11 n. 9 (1st Cir.2002) ("[U]nder Massachusetts law a municipality cannot be sued under the MCRA."). They also argue that, to the extent their officers are being sued in their individual capacities, they are not liable because there was no underlying section 1983 violation, and that, in any event, they are protected by qualified immunity. In their opposition, Plaintiffs merely argue in relation to Count V, as well as Counts VI, VII, and VIII, that "Plaintiffs' response to the defendant's statement of material fact is sufficient to a meritorious claim."

 "To establish an MCRA claim, [a plaintiff] must prove that his exercise or enjoyment of rights secured by the constitution or laws of either the United States or Massachusetts have been interfered with, or attempted to be interfered with, by threats, intimidation, or coercion." *Santiago v. Keyes,* 890 F.Supp.2d 149, 153–54 (D.Mass.2012) (citing MASS. GEN. LAWS ch. 12, § 11H and 11I). "A 'threat' means 'the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.'" *Goddard v. Kelley,* 629 F.Supp.2d 115, 128 (D.Mass.2009) (quoting *Planned Parenthood League of Massachusetts, Inc. v. Blake,* 417 Mass. 467, 631 N.E.2d 985, 990 (1994)). "'Intimidation' means putting a person in fear for the purpose of compelling or deterring his or her conduct." *Id.* "'Coercion' means application of physical or moral force to another to constrain him to do against his will something he would not otherwise do." *Id.* "Accordingly, the MCRA contemplates a two-part sequence: liability may be found where (1) the defendant threatens, intimidates, or coerces the plaintiff in order to (2) cause the plaintiff to give up something that he has a constitutional right to do." *Santiago,* 890 F.Supp.2d at 154.

 The constitutional violation itself, however, "cannot satisfy both the 'threats, intimidation or coercion' and 'violation' elements of an MCRA claim." *Fontanez v. City of Worcester,* 2012 WL 2829613, at *7 (D.Mass. July 7, 2012); see also *Santiago,* 890 F.Supp.2d at 155 (recognizing the dispute over whether direct violations can satisfy both prongs of the MCRA analysis and concluding that "the better approach" is that the constitutional violation itself cannot satisfy both prongs). Therefore, Plaintiffs must demonstrate that "the officers threatened, intimidated, or coerced them in order to cause them to give up

some other right (for example, the right to vote)." *Fontanez,* 2012 WL 2829613, at *7. Plaintiffs have not presented any evidence to this effect. *See Bettencourt v. Arruda,* 2012 WL 5398475, at *13 (D.Mass. Nov. 1, 2012) ("While [the plaintiff] has put forth sufficient facts to support a claim that [the defendant's] conduct constituted a ·direct violation of his Fourth Amendment right, '[w]hat is absent … is any showing … that the violation was intended to coerce [the plaintiff] into refraining from the exercise of a right or privilege secured by law.'" (quoting *Farrah ex rel. Estate of Santana,* 725 F.Supp.2d at 248)). Accordingly, the court will enter summary judgment in Defendants' favor on Count V.

### F. *Malicious Prosecution (Count VI)*

In Count ·VI, Plaintiffs allege that Defendants "knew they lacked probable cause to search the Plaintiffs' two properties … and knew they lacked probable cause to believe the Plaintiffs had committed a larceny, yet despite their knowledge, the Defendants obtained a search warrant, illegally and under false pretenses, conducted a search of 5 and 4 Bach Lane … and performed and/or participated in an illegal arrest and prosecution of [Steven Opalenik]." In their motion for summary judgment, the Hadley Defendants argue that Plaintiffs cannot demonstrate malice, an element of a malicious prosecution claim, because they had a reasonable belief that the process was lawful and acted in good faith. The South Hadley Defendants, in turn, argue that Steven Opalenik's conviction is conclusive proof that Defendants had probable cause for the charges and, therefore, his malicious prosecution claim must fail.

■ As an initial matter, the court agrees with· the South Hadley Defendants that Plaintiffs have asserted a malicious prosecution claim under state law and not

under section 1983, their having failed to cite section 1983 in relation to this claim. Pursuant to state law, "[t]o establish a claim of common-law malicious prosecution, [a] plaintiff must show (1) the commencement or continuation of a criminal proceeding against the eventual plaintiff at the behest of the eventual defendant; (2) the termination of the proceeding in favor of the accused; (3) an absence of probable cause for the charges; and (4) actual malice." *LaFrenier v. Kinirey,* 478 F.Supp.2d 126, 141 (D.Mass.2007) (quoting *Nieves v. McSweeney,* 241 F.3d 46, 53 (1st Cir. 2001)). Moreover, "[t]he general rule in this Commonwealth is that conviction in the tribunal to which complaint was made, although reversed on appeal, is conclusive proof of probable cause, unless that conviction (1) was obtained solely by false testimony of the defendant in the action for malicious prosecution, or (2) is impeached on some ground recognized by law, such as fraud, conspiracy, perjury or subornation of perjury as its sole foundation." *Della Jacova v. Widett,* 355 Mass. 266, 244 N.E.2d 580, 582 (1969) (internal quotation marks omitted); *see also Meehan v. Town of Plymouth,* 167 F.3d 85, 90 (1st Cir. 1999).

■ Here, Plaintiffs have not presented any evidence demonstrating that the exceptions listed in *Della Jacova* apply. Accordingly, as the South Hadley Defendants argue, Steven Opalenik's conviction in the state trial court is conclusive proof of probable cause, a lack of which is required to succeed on a malicious prosecution claim. The court also agrees with the Hadley Defendants that Plaintiffs have not set forth sufficient evidence of malice. As a result, the court will enter summary judgment in favor of Defendants on Count VI.

G. *Intentional Infliction of Emotional Distress ("IIED") and Negligent Infliction of Emotional Distress ("NIED") (Count VII)*

In Count VII, Plaintiffs allege that "[t]he intentional and/or reckless and/or grossly negligent and/or negligent conduct engaged in by the Defendants named herein was outrageous beyond the scope of common decency. Furthermore, the Defendants conduct was such that it would shock the conscience of any decent person in a civilized society."

In their motion for summary judgment, the Hadley Defendants argue, in regard to the IIED claim, that Plaintiffs have failed to demonstrate that Defendants' conduct was extreme and outrageous; in regard to the NIED claim, they argue that Plaintiffs have failed to demonstrate physical harm. The South Hadley Defendants, in turn, argue that Plaintiffs' IIED claim fails, to the extent Plaintiffs are asserting official capacity claims, because M.G.L. c. 258, § 10(e) bars claims against municipalities for intentional torts and, to the extent they are asserting individual capacity claims, because the South Hadley Defendants' conduct was objectively reasonable. As for the NIED claim, the South Hadley Defendants argue that it fails, to the extent Plaintiffs are asserting official capacity claims, because municipalities are immune from liability for discretionary functions under M.G.L. c. 258, § 10(b) and, to the extent they are asserting individual capacity claims, because public employees are not liable for negligence while acting within the scope of employment under M.G.L. c. 258, § 2.

1. *IIED*

■ "[T]he Massachusetts Tort Claims Act, G.L. c. 258 § 10(c) bars claims against the Commonwealth, its agencies, and municipalities for intentional torts...." *Free-*

*man,* 849 F.Supp.2d at 157; *see also Mellinger v. Town of West Springfield,* 401 Mass. 188, 515 N.E.2d 584, 589 (1987) ("Because normally the town cannot be held liable for intentional torts ... the intentional infliction of emotional distress claim was properly dismisses as to the town."). Accordingly, Plaintiffs' official capacity IIED claim fails as a matter of law.

■ Regarding the individual capacity IIED claim, Plaintiffs, to prevail, must prove that "(1) Defendants intended to cause emotional distress or should have known that emotional distress was the likely result of their conduct; (2) Defendants' conduct was extreme and outrageous, beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) Defendants' actions were the cause of [Plaintiffs'] emotional distress; and (4) [Plaintiffs] suffered emotional distress so severe that no reasonable person could be expected to endure it." *Freeman,* 849 F.Supp.2d at 159–160.

■ The court agrees with Defendants that the facts of this case do not rise to the level of "extreme and outrageous" conduct. *Cf. Boyle v. Wenk,* 378 Mass. 592, 392 N.E.2d 1053, 1054–56 (1979). Searching Plaintiffs' property pursuant to a duly issued search warrant, searching beyond the scope of the warrant in the circumstances of this case, and then arresting Steven Opalenik upon the discovery of an illegal marijuana operation were not, in the court's view, "utterly intolerable in a civilized community." *See Sena v. Commonwealth,* 417 Mass. 250, 629 N.E.2d 986, 994 (1994) ("Neither applying for an arrest warrant, nor making an arrest pursuant to an issued warrant can be considered 'utterly intolerable in a civilized community.' "); *Aguoji v. Harvard University,* 77 Mass.App.Ct. 1115, 2010 WL 3170761, at *2 (Mass.App.Ct.2010) ("The arrest of a

person upon the basis of probable cause to believe that he has committed, or is committing, a criminal offense does not constitute 'extreme or outrageous' conduct, 'beyond all possible bounds of decency and utterly intolerable in a civilized community.' ").

## 2. NIED

 To prevail on their NIED claim, Plaintiffs must prove: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Sullivan v. Boston Gas Co.*, 414 Mass. 129, 605 N.E.2d 805, 807 (1993) (internal quotation marks omitted). Under section 10(b) of the MTCA, however, public employers are immune from liability for claims of negligent infliction of emotional distress where the alleged negligent acts arise from discretionary functions. The Supreme Judicial Court has held that "[t]he decisions of law enforcement officers regarding whether, when, how, and whom to investigate, and whether and when to seek warrants for arrest are based on considerations of, and necessarily affect, public policy" and, therefore, "fall within the exception of § 10(b)." *Sena*, 629 N.E.2d at 990. Similarly, this court concludes, pursuing and executing search warrants are discretionary functions. Therefore, discretionary function immunity applies to the official capacity NIED claims and Plaintiffs cannot prevail.

 Under section 2 of the MTCA, a public employee shall not be liable "for any injury or loss of property or personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment." Police officers acting pursuant to a search warrant are public employees acting within the scope of their employment. *See Sadlowski v. Benoit*, 2008 WL 2745157, at *7 (Mass.Super. June 26, 2008). Therefore, Plaintiffs individual capacity NIED claims are also barred. In addition, as the Hadley Defendants argue, Plaintiffs have not presented any evidence demonstrating that they have suffered physical harm as a result of their emotional distress. *See Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171, 181 (1982) ("[I]n order for any of these plaintiffs to recover for negligently inflicted emotional distress, she must allege and prove she suffered physical harm as a result of the conduct which caused the emotional distress."). Accordingly, the court will enter summary judgment in favor of Defendants on Count VII.

## H. Defamation (Count VIII)

In Count VIII, Plaintiffs allege that Defendants "published false and defamatory statements against Plaintiffs including but not limited to statements accusing them of a crime, which are per se defamatory." In their motion for summary judgment, the Hadley Defendants argue that making an arrest public does not constitute defamation because the arrest is a fact. The South Hadley Defendants argue as well that there is no evidence that Defendants made "false" statements and that any statements were made in the course of judicial proceedings, which make them absolutely privileged.

 "To prevail on a defamation claim under Massachusetts law, a plaintiff must show that the defendant was at fault for the publication of a false statement of and concerning the plaintiff which was capable of damaging his or her reputation in the community, and which either caused economic loss or is actionable without proof of economic loss." *Freeman*, 849 F.Supp.2d at 160 (quoting *Damon v.*

*Moore,* 520 F.3d 98, 103 (1st Cir.2008)). "Charges of crime are slanderous and actionable per se without proof of special damage." *Sietins v. Joseph,* 238 F.Supp.2d 366, 378 (D.Mass.2003) (internal quotation marks omitted). "However, it is well settled that statements made in the course of judicial proceedings which pertain to those proceedings are absolutely privileged and cannot form the basis for a defamation claim, even if uttered with malice or in bad faith." *Id.* "Similarly, an application for a criminal complaint is generally considered as involving a form of judicial proceeding and the statements made therein are absolutely privileged." *Id.* (internal quotation marks omitted).

▉ Here, Plaintiffs have not pointed to any allegedly false statements, let alone any evidence showing that Defendants made a false statement. At best, Steven Opalenik testified at his deposition that the defamation claim was based upon his arrest which went to court and became public and that the public record was, thus, replete with wrongful allegations about him and Mrs. Opalenik burglarizing a home. (See So. Hadley SOF; Exhibit 4 (attached to So. Hadley SOF) at 166.) To the extent these are the statements about which Plaintiffs now complain, they are absolutely privileged since they derive directly from "statements made in the course of judicial proceedings." *See id.*

To be sure, Plaintiffs take issue with the South Hadley Defendants' statement that "[a]ll of the information [in articles the Opaleniks' contend support their defamation claim] is either based on information contained in court documents, stated by non–South Hadley Defendants or is based on truth." (Plaintiff's Response to So. Hadley SOF.) In contesting that assertion, however, Plaintiffs still do not point to any evidence showing that Defendants' statements in the articles—which have not been provided to the court—are false. Therefore, Plaintiffs have not presented sufficient evidence upon which a reasonable jury could find that Defendants are liable for defamation. Accordingly, the court will enter summary judgment on Count VIII in favor of Defendants.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment are ALLOWED as to Counts I, III, IV, V, VI, VII and VIII, as well as to those portions of Count II asserting that the initial search warrant was not supported by probable cause, the arrest was not supported by probable cause, and the search of the shed was beyond the scope of the warrant. The court, however, DENIES Defendants' motions for summary judgment as to that portion of Count II asserting claims against Dominick and Bertera for searching the recording studio, which was beyond the scope of the initial search warrant. The Clerk shall schedule a pretrial conference and trial. SO ORDERED.